**J. PARRA e HIJOS, S.A. de C.V., Appellant,**

v.

**Rafael BARROSO, Appellee.**

No. 13–96–290–CV.

Court of Appeals of Texas, Corpus Christi.

Oct. 30, 1997.

Veda Ann Moore, Sugar Land, for Appellant.

Harold R. McKeever, Payne & Blanchard, Mark Ben Greenberg, Dallas, for Appellee.

Before SEERDEN, C.J., and FEDERICO G. HINOJOSA, Jr. and CHAVEZ, JJ.

## OPINION

CHAVEZ, Justice.

The trial court entered a take-nothing judgment in favor of appellee, Rafael Barroso ("Barroso"). We will affirm.

### Factual background

Appellant, J. Parra e Hijos, S.A. de C.V. ("Parra e Hijos"), is a Mexican corporation based in Mexico City, Mexico which manufac-

tures plastic eating utensils. Parra e Hijos is run by Arturo Parra Zapata ("Arturo Parra"),[1] its general manager, who is a Mexican citizen. Barroso, who (at the time of events giving rise to the underlying suit) apparently had homes in both Cameron County, Texas and in Mexico,[2] is also a Mexican citizen. The record indicates that Barroso owned 80% –90% of the stock in Stankell Corporation ("Stankell"), a Texas corporation [3] doing business in Cameron County, Texas as well as an equivalent interest in Tex–Tex, S.A. ("Tex–Tex"), a Mexican corporation doing business as a *maquiladora* in Matamoros, Tamaulipas, Mexico. Apparently, Tex–Tex packaged plastic eating utensils for later sale by Stankell. Peter Osmers ("Osmers") was the general manager of Stankell. The record also indicates that Barroso is the sole shareholder in a corporation known as "Royal Viking," which existed to own various realty. The instant dispute arises from the sale of goods by Parra e Hijos to Stankell and/or Barroso.

Prior to November 2, 1986, Barroso approached Arturo Parra in Mexico City with a proposal to supply plastic utensils. Parra e Hijos was interested in doing business, but wanted any goods delivered to be secured by a letter of credit. At some point (perhaps after Arturo Parra's journey to Cameron County, Texas and Matamoros, Mexico), Parra e Hijos waived its letter of credit requirement in order to do business with Barroso.

Arturo Parra traveled to Cameron County, Texas, being met at the Brownsville airport by Barroso and taken to a ranch near San Benito, Texas, where Stankell maintained its offices and warehouse. Barroso testified that the warehouse was emblazoned with a Stankell sign on its side. Arturo Parra was also taken to the offices of the San Benito Bank & Trust Company ("San Benito Bank"), to the Tex–Tex facilities in Matamoros, Mexico, and later to Barroso's house in Rancho Viejo, Texas. Arturo Parra was told

1. The individuals discussed in this opinion are referred to by their surnames; in accordance with custom, Mexicans are identified by their paternal surnames. However, to avoid confusion between Parra e Hijos and Arturo Parra Zapata, we refer to Arturo Parra Zapata by his first name and paternal surname.

2. The record indicates Barroso resided in the *Distrito Federal* and/or the state of Mexico.

3. A certified copy of Stankell's articles of incorporation appear in the record.

about Barroso's condominium at South Padre Island, Texas.

The precise date on which Parra e Hijos began doing business with entities owned by Barroso is unclear, as the testimony at trial was varied. In any event, the trial exhibits contain a copy of a six-month importation permit for a plastic injection mold, issued in Matamoros, Mexico on November 3, 1986, by the Mexican *Secretaría de Hacienda y Crédito Público* (federal secretary of treasury/finance), *Dirección General de Aduanas* (general customs directorate). According to the permit, Parra e Hijos was the importer, and "Stankell Corp., P.O. Box 5805, Brownsville, Texas" was the provider. Trial testimony indicated that the injection mold was needed to set up production lines. Some time thereafter, Parra e Hijos began supplying Barroso's entities.

The record indicates that Stankell did not become significantly delinquent in its account with Parra e Hijos until, approximately, 1990. The record contains a copy of a check, dated "11–2–87," payable to Parra e Hijos, drawn on Stankell's account at San Benito Bank, and signed by Barroso; this check is the only writing in the record which Barroso signed on behalf of Stankell. The record also contains copies of daily production records from Parra e Hijos, from the month of June 1988, which identify Parra e Hijos's client as "Stankell."

The record contains copies of six purchase orders from "Stankell Corp.," to Parra e Hijos, ordering shipment of goods to "Stankell c/o Tex , Matamoros, Tamps." The purchase orders span the period of "10/10/90" to "12/18/90," and are signed as follows:

Stankell Corporation

Buyer /s/ P. Osmers Gen. Mgr,

Merchandise was indisputably shipped according to the purchase orders.

The record also contains twenty-one invoices (corresponding to the aforementioned purchase orders), forwarded to "Stankell Corp." in Brownsville, spanning the period from October 17, 1990 to February 28, 1991.

The smallest of the invoices was for $6,813.34.[4] Altogether, the invoices evidence an undisputed debt of $182,267.34. The invoices were not paid, and in March 1991, Arturo Parra traveled to Cameron County, Texas with an employee of Parra e Hijos, Mauricio Quintana Rosas ("Quintana"), for a workout meeting at Stankell's offices at the San Benito ranch.

Testimony at trial varied as to who negotiated with whom at the meeting, but the outcome of the meeting was that Parra e Hijos granted a $20,000 discount (reducing the total debt to $162,267.34), in exchange for which two checks (one for $100,000, and the other for $62,267.34) were given to Parra e Hijos. The checks were to be drawn on Stankell's account at San Benito Bank, and were signed by Osmers. The discount agreement was memorialized by a letter dated March 20, 1991, on Stankell letterhead, and signed by Osmers for Stankell and Arturo Parra for Parra e Hijos. The checks were, however, dishonored by San Benito Bank, as Osmers had executed stop payment orders at the bank.

Testimony at trial indicated that, at some point roughly contemporaneous with the execution of the stop payment orders by Osmers, both Stankell and Tex–Tex became insolvent. The record indicates that Stankell filed a petition in bankruptcy. The record also indicates that Parra e Hijos did not file a proof of claim in the Stankell bankruptcy. Stankell's major valuable asset—a packaging machine used by Tex–Tex in Matamoros—had been seized in Mexico as a consequence of the Tex–Tex insolvency. The San Benito ranch had been merely leased by Stankell from Royal Viking, its true owner, and Barroso's condominium at South Padre Island was also owned by Royal Viking.

On February 11, 1992, Parra e Hijos filed its original petition against Barroso, Osmers and San Benito Bank. Parra e Hijos pled claims of fraud, alter ego, and guaranty against Barroso, and conspiracy to commit fraud against Barroso and Osmers. San Benito Bank was sued for wrongful dishonor.

---

**4.** All transactions evidenced in the record are denominated in American dollars, as are all references thereto in this opinion.

San Benito Bank filed its "Notice to the District Clerk of Filing of Notice of Removal" on February 28, 1992, and the lawsuit was removed to federal court. On March 24, 1992, Osmers, individually, filed a suggestion of bankruptcy in federal district court, staying collection efforts against him by Parra e Hijos. Barroso and San Benito Bank were severed out of the action against Osmers, and the federal court signed an "Agreed Order of Remand" on March 5, 1993, remanding the case against Barroso and San Benito Bank back to state court. At an indeterminate point, Parra e Hijos settled its claims against San Benito Bank, leaving Barroso as the remaining defendant in the lawsuit.[5]

The suit against Barroso was tried to the bench on February 1, 1996. Testimony was received from Arturo Parra, Quintana, and Barroso. Osmers did not testify, and the testimony of Barroso indicated that Osmers had "disappeared the following day after ... the bankruptcy."

Arturo Parra was the first witness. The following testimony was received from him:

Q. Did he [Barroso] talk to you about the Stankell Corporation being the company you were going to do business with?

A. Yes.

Q. And what did he say to you in that regard?

A. "This is my company and I will support everything from my company."

.    .    .    .    .

Q. You agree with me, do you not, sir, that you do not have a written guarantee [sic] signed by Mr. Barroso where he guarantees any debts of Stankell Corporation, correct?

A. No. I got his word.

According to Arturo Parra, payments by Stankell, during 1988 and 1989, proceeded "perfectly," and Barroso would often personally deliver Stankell checks to Parra e Hijos in Mexico City. Arturo Parra also testified that Parra e Hijos shipped goods after receiving purchase orders from Stankell, and that invoices were forwarded to Stankell. When asked, "What was your understanding as to why you were addressing your invoice to Stankell instead of Mr. Barroso?," he answered, "Well, I think it was for commercial stuff, or whatever."

Quintana, the Parra e Hijos employee who attended the March 1991 workout meeting at Stankell's offices, testified as follows about the anticipated payment of Stankell's account pursuant to the discount agreement:

Q. Did you hear Mr. Barroso say where and when he would make that payment?

A. Just in a few days in Mexico City.

Q. All right. And after that agreement, was anything, was anything done with respect to, such as a handshake or a writing or anything, to memorialize what they had agreed to?

A. I asked for in that meeting to—I mean, write something of what we were talking, no? And they tell me, "It's just our word and that's it." Okay.

Q. And so then you left with Mr. [Arturo Parra] Zapata and returned to Mexico City?

A. Yes.

Barroso was the final witness, and he testified that Arturo Parra traveled to Cameron County, Texas and Matamoros, Mexico, prior to commencing a business relationship with Barroso and his entities, not to view Barroso's assets as a precursor to his decision to waive Parra e Hijos's letter of credit requirement, but rather to "familiarize himself with the business." Barroso testified that, when Osmers traveled to Mexico City on Stankell's business, Osmers would usually pay a visit to Barroso. However, Osmers had made trips to Mexico City without Barroso's knowledge, during which Osmers placed large orders with Parra e Hijos that Barroso thought were excessive. Osmers assured Barroso that a buyer would be found for the products

---

5. Prior to trial, Parra e Hijos streamlined its claims against Barroso, the remaining defendant, by admitting the following in response to discovery propounded by Barroso: "[P]laintiff's [Parra e Hijos's] claim against Defendant Rafael Barroso is based upon a primary and not secondary obligation. It is irrelevant whether or not Mr. Barroso signed any document wherein he agreed to answer for the debt of Stankell Corporation (to any creditor of Stankell Corporation). Plaintiff has made no claim herein as a creditor of Stankell Corporation."

he ordered. Barroso testified that he (Barroso) had wanted to return the surplus goods to Parra e Hijos. In fact, Barroso and Arturo Parra discussed the return of the goods over breakfast in Mexico City, but Parra e Hijos refused to accept them.

On February 27, 1996, the trial court signed a take-nothing judgment in favor of Barroso. On April 2, 1996, the court signed its findings of fact and conclusions of law. The court made forty-five findings of fact and twenty conclusions of law. This appeal ensued on five points of error.

The first four points of error are legal ("as a matter of law") and factual ("against the great weight and preponderance") sufficiency challenges; each point complains of multiple findings and conclusions (except for the fourth point, which complains of one finding and one conclusion). The first point of error complains of the trial court's failure to hold Barroso individually liable to Parra e Hijos under contractual theories. The second point of error relates to Parra e Hijos's negligent misrepresentation claim, which is arguably contained in its "First Supplemental Answer" (which we treat as a supplemental petition). The third point of error relates to Parra e Hijos's fraud claims against Barroso. The fourth point of error complains of the trial court's failure to award punitive damages. The fifth point of error relates to all theories of liability pled by Parra e Hijos.

Although Parra e Hijos directs our attention throughout its appellate brief to the trial court's conclusion of law, and related findings of fact, which denied relief to Parra e Hijos under a promissory estoppel theory, such a theory is not pleaded by Parra e Hijos, at least insofar as the record discloses; accordingly, we need not address this issue, as it is meaningless to our final disposition. TEX. R.APP. P. 47.1; *see also* Tex.R. Civ. P. 301 ("The judgment of the court shall conform to the pleadings[.]"). Further, we consider the doctrine of promissory estoppel inapposite to the issues in the case at bar. *See, e.g., Collins v. Allied Pharmacy Management, Inc.,* 871 S.W.2d 929, 937 (Tex.App.—Houston [14th Dist.] 1994, no writ) ("Promissory estoppel operates to preclude a statute of frauds defense only where the promise is to sign a written agreement complying with the statute."). We shall address the points of error in the order in which they were raised by Parra e Hijos.

### Standards for review

■ Where a party challenges a trial court's conclusions of law, we may sustain the conclusion on any legal theory supported by the evidence. *Kotis v. Nowlin Jewelry, Inc.,* 844 S.W.2d 920, 922 (Tex.App.—Houston [14th Dist.] 1992, no writ) (citing *Simpson v. Simpson,* 727 S.W.2d 662, 664 (Tex.App.—Dallas 1987, no writ)). Incorrect conclusions of law will not require reversal if the controlling findings of facts will support a correct legal theory. *Kotis,* 844 S.W.2d at 922.

A party asserting a "matter of law" challenge as to factual matters must surmount two hurdles.. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). First, the record must be examined for evidence that supports the trier of fact's finding, while ignoring all evidence to the contrary. *Id.* Second, if there is no evidence to support the fact finder's answer, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.*

■ Concerning the factual sufficiency challenges, we are required to weigh all. of the evidence and to remand the cause for a new trial if we conclude that the trier's finding was so against the great weight and preponderance of the evidence as to be manifestly unjust. *Traylor v. Goulding,* ·497 S.W.2d 944, 945 (Tex.1973) (citing *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951)).

### Contract Liability: Uniform Commercial Code and the Law of Agency

■ If the Uniform Commercial Code ("UCC"), Texas Business & Commerce Code, sections 1.101, *et seq.,* applies to the case at bar, it will be dispositive of the first point of error. We first analyze the applicability of the UCC, as this case has an obvious and significant connection to Mexico.

Section 1.105 of the UCC provides that, when a transaction bears a reasonable relation to Texas and also to another nation, the parties thereto may agree that the law of either Texas or of such other nation shall govern their rights and duties. TEX. BUS. & COM.CODE ANN. § 1.105(a) (Vernon 1994). Absent a contractual choice-of-law provision, the UCC applies to transactions bearing an "appropriate relation" to Texas. *Id.* The record in the case at bar discloses no choice-of-law agreement. Accordingly, we determine whether the transactions underlying this suit have an appropriate relation to Texas. *Id.* The precise nature of an appropriate relation supporting application of the UCC is not clarified by our state's jurisprudence, but the UCC's commentary instructs that "the question what relation is 'appropriate' is left to judicial decision." TEX. BUS. & COM.CODE ANN. § 1.105 cmt. 3 (Vernon 1994). Policy considerations favoring application of the UCC include "the fact that [the UCC] is in large part a reformulation and restatement of the law merchant and of the understanding of a business community which transcends state and even national boundaries." *Id.*

In the case at bar, facts weighing in favor of determining that an appropriate relation to Texas exists include:

- Barroso had a home in Texas;
- Stankell was a Texas corporation;
- purchase orders underlying this case originated in Texas;
- invoices underlying this case were forwarded to Texas;
- Stankell's checks were to be drawn on a Texas bank; and
- the workout of Stankell's account was negotiated in Texas.

On the other hand, facts weighing in favor of determining that an appropriate relation to Texas does not exist include:

- Parra e Hijos is a Mexican corporation;

- Barroso is a Mexican citizen, and resides (according to his attorney's certificate) in the state of Mexico or (according to his trial testimony) in Mexico City;
- the goods underlying this suit were shipped, pursuant to Stankell's purchase orders, from Mexico City and delivered to the facilities of Tex–Tex, a Mexican corporation, in Matamoros, Mexico; and
- many, if not most, of the meetings between Barroso and/or Osmers and Parra e Hijos occurred in Mexico City.

Given the fact that numerous factors would support either determination, we find one factor particularly persuasive: Parra e Hijos chose Texas as the forum for its suit against Barroso. While we do not speculate as to what the outcome of the litigation would be under Mexican law,[6] we note that the underlying sale of goods significantly touched Cameron County, Texas; Matamoros, Tamaulipas, Mexico; and Mexico City. Because Parra e Hijos chose to litigate in Texas, and in light of policy considerations, we determine that an appropriate relation to Texas exists under the facts of the case at bar, and we shall give effect to the UCC.

Pursuant to section 2.201 of the UCC, a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made by the parties and signed by the party (or agent thereof) against whom enforcement is sought. TEX. BUS. & COM. CODE ANN. § 2.201(a) (Vernon 1994). The UCC's parol evidence rule generally prohibits the contradiction of contract terms by evidence of a prior agreement or of a contemporaneous oral agreement. TEX. BUS. & COM.CODE ANN. § 2.202 (Vernon 1994). We have previously noted that, "[w]hen contracting parties have concluded a valid integrated agreement, whether written or oral, dealing with the particular subject matter they have between them, the parol evidence rule prevents the enforcement of prior or contempo-

---

**6.** Neither Parra e Hijos nor Barroso have urged the application of Mexican law. "In the absence of proper invocation of foreign law, Texas courts must presume the foreign law to be the same as that of Texas." *Country Cupboard, Inc. v. Texstar*

*Corp.,* 570 S.W.2d 70, 72 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.) (citing *Gevinson v. Manhattan Construction Co. of Oklahoma,* 449 S.W.2d 458 (Tex.1969)).

raneous agreements which are inconsistent with the integrated agreement." *Hallmark v. Port/Cooper–T. Smith Stevedoring Co.*, 907 S.W.2d 586, 590 (Tex.App.—Corpus Christi 1995, no writ) (citing *Weinacht v. Phillips Coal Co.*, 673 S.W.2d· 677, 679 (Tex.App.—Dallas 1984, no writ)).

The UCC's statute of frauds clearly applies in the case at bar, as each invoice subject to the letter agreement of March 20, 1991 exceeds $500. In addition, Parra e Hijos's petition is founded on the dishonored checks in the amount of, respectively, $100,000 and $62,267.34; the checks were delivered pursuant to the March 20, 1991 letter agreement, which was signed by Osmers (for Stankell) and Arturo Parra (for Parra e Hijos). We determine that the letter agreement represented a valid and subsisting contract between Stankell and Parra e Hijos. Prior to the signing of the letter agreement, the·contract between Stankell and Parra e Hijos consisted of the Stankell purchase orders and the corresponding invoices from Parra e Hijos.

■ No writing exists in the record evidencing a contract between Barroso, individually, and Parra e Hijos. Although Arturo Parra testified that Barroso had told him that "I will support everything from my company," we do not view this as an offer to incur personal liability. In any event, such oral promises are denied legal effect by the parol evidence rule.

■ Parra e Hijos contends that, notwithstanding the mandates of the UCC, under the law of agency Barroso was required to unequivocally disclose the identity of his principal, Stankell Corporation, in order to avoid personal liability. Indeed, "[w]e are aware that in order to avoid personal liability, an agent has the duty to disclose not. only that he is acting in a representative capacity but also the identity of his principal." *Gonzales County Water Supply Corp. v. Jarzombek*, 918 S.W.2d 57, 60 (Tex.App.—Corpus Christi 1996, no writ) (citing *A to Z Rental Center v. Burris*, 714 S.W.2d 433, 435 (Tex. App.—Austin 1986, writ ref'd n.r.e.)). One acting as agent for another in making a contract is individually liable on the contract if, at the time of making the contract, the agent fails to disclose his agency and the identity of his principal. *See Dodds v. Charles Jourdan Boutique, Inc.*, 648 S.W.2d 763, 766 (Tex.App.—Corpus Christi 1983, no writ); *see also Heinrichs v. Evins Personnel Consult., Inc., No. One*, 486 S.W.2d 935, 937 (Tex.1972); *Trailways, Inc. v. Clark*, 794 S.W.2d 479, 491 (Tex.App.—Corpus Christi 1990, writ denied). However, we also note that "[i]t is recognized in this state that circumstances may exist which would put the person with whom the agent is dealing on notice of inquiry of the existence of a principal." *Carter v. Walton*, 469 S.W.2d 462, 472 (Tex.Civ.App.—Corpus Christi 1971, writ ref'd n.r.e.).

· We believe that Arturo Parra's trial testimony, as well as Parra e Hijos's production records identifying Stankell as Parra e Hijos's client, and invoices forwarded to Stankell by Parra e Hijos, establish that actual disclosure of the identity of Barroso's principal, as well as the existence of a principal/agent relationship, was made by Barroso in the early stages of their business courtship. Alternatively, we note the existence of numerous factors sufficient to have put Parra e Hijos on notice of the existence of an agency relationship, therefore devolving a duty of inquiry onto Parra e Hijos. These factors include: the importation document naming Stankell as the provider of the injection mold; the Stankell sign on the side of the warehouse at the San Benito ranch; purchase orders bearing Stankell's name and address; payment by checks drawn on Stankell's account at San Benito Bank, including at least one check signed by Barroso for Stankell; the convening of the workout meeting in March 1991 at Stankell's offices; and . the memorialization of the discount agreement on Stankell's stationery. Even if no actual disclosure of the agency relationship was made by Barroso, Parra e Hijos was not free to ignore the numerous factors which placed it on notice of the fact of agency. Parra e Hijos's contention that Barroso should be held personally liable under agency principles is without merit.

Having disposed of the agency contention, we return to the UCC. The only writings which comport with the UCC's statute of

frauds exist between Stankell and Parra e Hijos. *See* TEX. BUS. & COM.CODE ANN. § 2.201 (Vernon 1994). The UCC's parol evidence rule prohibits Parra e Hijos from impeaching their contract with Stankell. *See* TEX. BUS. & COM.CODE ANN. § 2.202 (Vernon 1994). The evidence supports the trial court's conclusions of law, as well as its findings of fact. Under the evidence, the trial court's determinations are not manifestly unjust. The first point of error is overruled.

### Negligent misrepresentation

▪ The elements of a cause of action for negligent misrepresentation are as follows: (1) a representation is made by the defendant in the course of his business, or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the defendant's misrepresentation. *Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991). In the case at bar, Arturo Parra's testimony that Barroso said he would "support everything from my company" is ample to defeat the "false information" element of the negligent misrepresentation tort. Further, based on the factors set forth above which also defeat Parra e Hijos's contentions under the law of agency, Parra e Hijos could not have justifiably relied on any alleged representation by Barroso that he agreed to incur personal liability for the goods ordered by and shipped to Stankell. In any event, "[n]egligent misrepresentation may not be used to circumvent the statute of frauds." *Collins,* 871 S.W.2d at 936 (citing *Federal Land Bank Ass'n of Tyler,* 825 S.W.2d at 442).

The evidence supports the trial court's findings and conclusions regarding Barroso's representations to Parra e Hijos. We further determine that the trial court's findings are not manifestly unjust, and the second point of error is, therefore, overruled.

### Fraud

▪ Application of the statute of frauds to a contract vitiates a fraud claim based on the same facts. *Collins,* 871 S.W.2d at 936. The essential inquiry in determining whether a plaintiff is attempting to use a fraud claim to circumvent the statute of frauds is to examine the nature of the injury that it alleges. *Leach v. Conoco, Inc.,* 892 S.W.2d 954, 960 (Tex.App.—Houston [1st Dist.] 1995, writ dism'd). When the injury is only the economic loss to the subject of the contract itself, the action sounds in contract alone. *See Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). Where a plaintiff is seeking to recover what it would have gained had the promise been performed, the gist of its cause of action is the breach of the unenforceable promise, and is barred by the statute of frauds. *Collins,* 871 S.W.2d at 936.

▪ Parra e Hijos sought to enforce its sales agreements pursuant to open account; it sought the benefit of its bargain. *See Collins,* 871 S.W.2d at 936. We hold, therefore, that Parra e Hijos has no claim for common law fraud under these facts. *Id.* The trial court's findings of fact and conclusions of law, as they relate to the fraud claim, are supported by the evidence; again, we hold that the trial court's determinations are not manifestly unjust. The third point of error is overruled.

### Punitive Damages

▪ Punitive damages are not recoverable for breach of contract. *Shelton Ins. Agency v. St. Paul Mercury Ins. Co.,* 848 S.W.2d 739, 747 (Tex.App.—Corpus Christi 1993, writ denied) (citing *Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986); *Jim Walter Homes, Inc.,* 711 S.W.2d at 618). This rule prevails even if the contract was maliciously breached. *Shelton Ins. Agency,* 848 S.W.2d at 747 (citing *Manges v. Guerra,* 673 S.W.2d 180, 184 (Tex.1984); *Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 571 (Tex.1981)). The party seeking punitive damages in a contract case must, therefore, secure at least one finding of an independent tort with accompanying actual damages. *Shelton Ins. Agency,* 848 S.W.2d at 747; *see*

*also* TEX. CIV. PRAC. & REM.CODE ANN. § 41.004(a) (Vernon Supp.1997) ("[E]xemplary damages may be awarded only if damages other than nominal damages are awarded.").

In the case at bar, Parra e Hijos did not obtain a finding of an independent tort with accompanying actual damages. *See Shelton Ins. Agency,* 848 S.W.2d at 747. We therefore hold that Parra e Hijos is not entitled to recover an award of punitive damages. *Id.* The trial court's findings and conclusions, as they relate to punitive damages, are supported by the evidence, and the trial court did not determine these issues in a manifestly unjust manner. The fourth point of error is overruled.

### Conspiracy to Commit Fraud, Guaranty, and Alter Ego,

The fifth point of error complains of the trial court's failure to grant relief on any of the liability theories pleaded by Parra e Hijos. To the extent that Parra e Hijos raises a point of error generally attacking the trial court's judgment, and then makes numerous arguments in support thereof, the point of error is multifarious, and may *ipso facto* be overruled. *See, e.g., Hollifield v. Hollifield,* 925 S.W.2d 153, 155 (Tex.App.—Austin 1996, no writ). However, we examine Parra e Hijos's arguments in the interest of justice.

Parra e Hijos's pleadings argue the following theories of liability *vis-a-vis* Barroso: negligent misrepresentation, fraud, conspiracy to commit fraud (with Osmers), alter ego, and guaranty. We have already disposed of Parra e Hijos's claims for fraud and negligent misrepresentation. The remaining liability theories are conspiracy to commit fraud, alter ego, and guaranty.

■ To succeed in a civil conspiracy claim, the plaintiff must prove as an essential element a meeting of the minds among the alleged conspirators. *See, e.g., Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206, 216 (Tex.App.—Houston [14th Dist.] 1991, writ denied) (citing *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983)). The testimony of Barroso indicates that the unpaid goods made the basis of the underlying suit were largely ordered by Osmers

without Barroso's knowledge or consent. Osmers did not testify. Accordingly, no evidence in the record supports the "meeting of the minds" element of civil conspiracy. In addition, the record does not disclose that the automatic stay as to Osmers has been terminated, therefore casting doubt as to whether the trial court could have adjudicated a claim embracing both Osmers and Barroso for which their liability, if any, would be interdependent. Parra e Hijos's claim of error regarding their cause of action for conspiracy among Barroso and Osmers to commit fraud is meritless.

■ As to Parra e Hijos's claim against Barroso for guaranty, we note that "[a] guaranty agreement creates a *secondary obligation* whereby the guarantor promises to be responsible for the debt of another and may be called upon to perform if the primary obligor fails to perform." *Tenneco Oil v. Gulsby Engineering,* 846 S.W.2d 599, 605 (Tex.App.—Houston [14th Dist.] 1993, writ denied) (Emphasis added.). "A guaranty agreement is to be strictly construed and shall not be extended beyond its precise terms by construction or implication." *Id.* Based on the law of guaranty, we believe that guaranty, as a derivative theory of liability, was necessarily abandoned by Parra e Hijos when it admitted in pretrial discovery that

> [P]laintiff's [Parra e Hijos's] claim against Defendant Rafael Barroso is based upon a primary and not secondary obligation. It is irrelevant whether or not Mr. Barroso signed any document wherein he agreed to answer for the debt of Stankell Corporation (to any creditor of Stankell Corporation). Plaintiff has made no claim herein as a creditor of Stankell Corporation. [Emphasis added.]

By its own admission, Parra e Hijos decided to forsake its claim of secondary liability against Barroso as a guarantor.

■ We also note that "a promise by one person to answer for the debt, default, or miscarriage of another person" is subject to the statute of frauds set forth in section 26.01 of the Texas Business & Commerce Code. TEX. BUS. & COM.CODE ANN. § 26.01 (Vernon 1987). One purpose of section 26.01 "is to prevent the recovery against one for the debt

of another in the absence of written evidence that he intended to be bound for the other's debt." *Menendez v. Texas Commerce Bank, McAllen, N.A.,* 730 S.W.2d 14, 15 (Tex. App.—Corpus Christi 1987, no writ). The record discloses no written evidence that Barroso promised to answer for obligations of Stankell. Thus, assuming *arguendo* that Parra e Hijos's claim for guaranty is not barred by its pretrial admission as set forth above, the guaranty claim would nevertheless be barred by operation of the applicable statute of frauds. Parra e Hijos's cause of action for guaranty is without merit.

■ Parra e Hijos's final cause of action, alter ego, seeks the piercing of Stankell's corporate veil to impose personal liability on Barroso, as Stankell's majority shareholder. Similar to the law of guaranty, alter ego is a secondary theory of liability. *See, e.g., Valley Mechanical Contractors v. Gonzales,* 894 S.W.2d 832 (Tex.App.—Corpus Christi 1995, no writ) ("Alter ego is one basis in law for disregarding the corporate fiction when there is such a unity between a corporation and an individual that an adherence to the fiction of separate existence would, under the particular circumstances, sanction a fraud or promote an injustice."). "The rationale behind the alter ego doctrine is that 'if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors.'" *Valley Mechanical Contractors,* 894 S.W.2d at 835 (quoting *Castleberry v. Branscum,* 721 S.W.2d 270, 271 (Tex.1986)).

■ We believe Parra e Hijos's alter ego claim is barred by its pretrial admission that "Plaintiff [Parra e Hijos] has made no claim herein as a creditor of Stankell Corporation." Absent a claim as a creditor of Stankell, we do not believe that Stankell's veil can be pierced to reach its shareholders. We note that Stankell, presumably on account of its bankruptcy action, has never (to the extent disclosed by the record) been a party to the underlying suit.

■ Further, a corporate shareholder is presumably not liable to corporate creditors "unless the obligee demonstrates that the holder, owner, or subscriber caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, or subscriber." TEX. BUS. CORP. ACT ANN. art 2.21 (Vernon 1980 & Supp.1997) ("Liability of Subscribers and Shareholders"). The standard for applying the exception to the general rule of shareholder nonliability has not been met by the evidence in the record. The evidence in the record indicates that the transactions (the large orders placed by Osmers in Mexico City) made the basis of the underlying suit were largely performed by Osmers, without the authorization of Barroso. The record also indicates that Barroso did not receive dividends or other monies from Stankell during its operations, and that Barroso essentially lost his investment with Stankell's bankruptcy. None of the traditional bases for alter ego liability (*e.g.,* undercapitalization, commingling) have been shown by Parra e Hijos.

We have previously held that the mere fact that a single individual owns a majority (or even all) of a corporation's stock does not by itself demonstrate that a corporation is the alter ego of an individual. *See Mitchell v. Rancho Viejo, Inc.,* 736 S.W.2d 757, 763 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.) (regarding 80% shareholder); *Aztec Mgmt. and Inv. v. McKenzie,* 709 S.W.2d 237, 239 (Tex.App.—Corpus Christi 1986, no writ). However, the crux of Parra e Hijos's alter ego claim appears to be that Barroso was the 80%–90% shareholder in Stankell. Based on the facts in the record, we determine that Parra e Hijos has no viable claim of alter ego against Barroso.

The trial court's findings and conclusions regarding all liability theories pleaded by Parra e Hijos are supported by the evidence. Having meticulously reviewed the entire record, we hold that the trial court's determinations were not manifestly unjust. The fifth point of error is overruled.

The judgment of the trial court is AFFIRMED.