**HARCO ENERGY, INC., Larry D. Cotten and Prime Western Development, Inc., Appellants,**

v.

**THE RE–ENTRY PEOPLE, INC., Appellee.**

No. 07–98–0194–CV.

Court of Appeals of Texas, Amarillo.

Feb. 2, 2000.

Rehearing Overruled April 5, 2000.

Winstead, Sechrest & Minick, P.C., F. Franklin Honea, Dale E. Butler, Christine Moseley, Peter Lando, Dallas, Melvyn C. Bruder, Dallas, for appellants.

Wheeler & McCray, P.L.L.C., Thomas M. Wheeler, Abilene, for appellee.

Before QUINN and REAVIS and JOHNSON, JJ.

PHIL JOHNSON, Justice.

Appellants Harco Energy, Inc., Larry D. Cotten and Prime Western Development, Inc., appeal from a judgment in favor of The Re–Entry People, Inc., based on an agreement for Re–Entry to perform oilfield services in Hardeman County. We affirm in part and reverse and render in part.

FACTUAL AND PROCEDURAL BACKGROUND

In late 1994 and early 1995, The Re–Entry People, Inc. (Re–Entry), entered into an agreement to perform drilling and associated services and to provide materials in connection with oil wells on the Ruth Hatcher Lease in Hardeman County, Texas. Re–Entry's agreement was made through Rock Thomas (Thomas), a shareholder and representative of the corporation. Thomas negotiated the agreement with appellant Larry D. Cotten (Cotten). During the relevant time periods Cotten was the president of Harco Land, Inc. (Land), Harco Energy, Inc. (Energy), and Prime Western Development, Inc. (Prime). Re–Entry was not paid for all its work on the Hatcher No. 2 well, and suit was eventually filed against Cotten, individually,

Land, Energy and Prime. Re–Entry based its suit on a sworn account with Land, and on allegations against all defendants for breach of contract, fraud, fraudulent transfer of assets, operation of the corporations as alter egos, and negligent misrepresentation. Re–Entry claimed that it should be able to pierce the corporate veil of Land and thereby hold Cotten, Energy and Prime liable for the actions and debts of Land. Liability of Land, Energy, and Prime was also claimed by reason of Cotten's agency status for the corporations when he made allegedly false representations to Re–Entry.

Following a bench trial, judgment was rendered for Re–Entry against Cotten, individually, Land, Energy, and Prime. The judgment was joint and several for the amounts remaining unpaid on the invoices from Re–Entry to Land, attorneys' fees, punitive damages, and pre- and post-judgment interest. No findings of fact and conclusions of law were requested and none were filed. Land did not appeal.[1] Cotten, Energy and Prime appeal from the judgment and urge by multiple issues that the evidence was both legally and factually insufficient to support judgment against them based on (1) breach of contract, (2) fraud, (3) fraudulent transfers and damages to Re–Entry from fraudulent transfers, (4) negligent misrepresentation, and (5) liability for actions or obligations of Land based on a piercing of Land's corporate veil.

## STANDARD OF REVIEW

■ In a bench trial, when findings of fact are neither requested or filed, the appellate court presumes all questions of fact were determined in support of the judgment, "provided that the proposition is raised by the pleadings, supported by the record, and sustainable on any reasonable theory consistent with the evidence and applicable law." *Employers Cas. Co. v. Texas Ass'n of School Boards Workers' Compensation Self–Ins. Fund,* 886 S.W.2d 470, 473 (Tex.App.—Austin 1994, writ dism'd w.o.j.).

■ In reviewing legal insufficiency issues we examine only the evidence which tends to support the finding, viewing the evidence in the light most favorable to the finding, giving effect to all reasonable inferences that may be drawn from the evidence, and disregarding all conflicting evidence. *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985).

■ In reviewing factual insufficiency issues, we consider all relevant evidence. *In re King's Estate,* 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951). A factual insufficiency issue will be sustained only if the finding of fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

## LAW

■ For a contract to exist, there must be an offer, an acceptance, and valid consideration. *Federal Sign v. Texas S. Univ.,* 951 S.W.2d 401, 408–09 (Tex.1997); *Hyman Farm Serv., Inc., v. Earth Oil & Gas, Inc.,* 920 S.W.2d 452, 457 (Tex.App.—Amarillo 1996, no writ); *Williford Energy Co. v. Submergible Cable Servs. Inc.,* 895 S.W.2d 379, 384 (Tex.App.—Amarillo 1994, no writ). To determine whether both parties have assented to the terms of a contract, a court must rely on objective standards. *Fuqua v. Fuqua,* 750 S.W.2d 238, 245 (Tex.App.—Dallas 1988, writ denied); *Gordin v. Shuler,* 704 S.W.2d 403, 407 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). A person who acts as an agent for another when making a contract must disclose the agency capacity and identify the principal in order to avoid being held personally liable for the contract. *Hideca Petroleum Corp. v. Tampimex Oil Intern., Ltd.,* 740 S.W.2d 838, 842 (Tex.App.—Houston [1st Dist.] 1987, no writ). Although circumstances may exist which would put a party

---

1. Thus, our decision does not affect the trial court's judgment against Land.

with whom an agent is contracting on notice that a principal-agent relationship exists, the agent is not relieved from liability just because the party with whom he is contracting could have conceivably discovered that the agent was working only in a representative capacity. *J. Parra e Hijos, S.A. de C.V. v. Barroso,* 960 S.W.2d 161, 168 (Tex.App.—Corpus Christi 1997, no writ); *Tampimex,* 740 S.W.2d at 842.

■■■■ To recover for fraud of another, a party must prove that (1) a material misrepresentation was made, (2) the representation was false, (3) the speaker knew that it was a false representation, (4) the speaker intended that it be acted upon by the other party, (5) the other party did indeed rely on the representation, and (6) the other party suffered damages as a result. *T.O. Stanley Boot Co., v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992); *Campbell v. C.D. Payne and Geldermann Sec., Inc.,* 894 S.W.2d 411, 425 (Tex.App.—Amarillo 1995, writ denied). In order for a promise to perform in the future to be fraudulent it must be proved that the allegedly defrauding party had no intention of performing the act or promise at the time the promise was made. *T.O. Stanley Boot Co.,* 847 S.W.2d at 222.

■■■■ The elements for a negligent misrepresentation cause of action are (1) a representation made by the defendant in the course of the defendant's business, or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Federal Land Bank Ass'n. v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991). The damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant. *Id.*

■■ One purpose of the corporate structure is to shield its shareholders from liabilities of the corporation. *Menetti v. Chavers,* 974 S.W.2d 168, 171 (Tex.App.—San Antonio 1998, no pet.). Texas case law and various statutory provisions allow for piercing the veil of a corporation or otherwise provide avenues for shareholders or others to be held liable for actions of the corporation. *E.g.,* TEX. BUS. CORP. ACT ANN. art. 2.21 (Vernon Supp.2000) (hereinafter TBCA); TEX. TAX CODE ANN. § 171.255 (Vernon 1992); *Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986). No liability for corporate contractual obligations may be imposed on a shareholder or affiliate of the corporation or shareholder under an alter ego or similar theory unless it is shown that the person on whom liability is sought to be imposed (1) caused the corporation to be used for the purpose of perpetuating, and (2) perpetrated an actual fraud on the obligee for the direct personal benefit of the person on whom liability is sought to be imposed. TBCA art. 2.21(A),(B); *Menetti,* 974 S.W.2d at 173–74.

The Uniform Fraudulent Transfer Act (UFTA) provides remedies to creditors of debtors who fraudulently transfer assets under certain circumstances as set forth in the statute. TEX. BUS. & COM.CODE ANN. §§ 24.005, 24.006, 24.008 (Vernon 1987 & Supp.2000). A transfer of assets is fraudulent as to a creditor whose claim arose before or within a reasonable time after the transfer was made if the debtor made the transfer (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) the debtor did not receive a reasonably equivalent value in exchange for the transfer and the debtor (a) was or was about to be engaged in transactions for which the remaining assets of the debtor were unreasonably small in relation to the transaction, or (b) intended to incur, or believed or reasonably should have believed the debtor would incur debts beyond the debtor's ability to pay as they became due. UFTA § 24.005(a). A transfer of assets is also fraudulent as to a creditor

whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time of or became insolvent as a result of the transfer of the assets. UFTA § 24.006(a). Unless displaced by its provisions, the UFTA supplements other principles of law and equity. UFTA § 24.011. The term "asset" under the UFTA does not include property to the extent it is encumbered by a "valid lien" as defined in the statute. UFTA § 24.002.(2)(A).

## ANALYSIS

Re–Entry claimed actual damages because its bills were not paid pursuant to an agreement that it would be paid for its work. Re–Entry claimed that Land was liable on a sworn account. Re–Entry based its other various theories against Land, Cotten, Energy and Prime on the unpaid bills as its damages. Its claims, in substance, were that (1) Cotten agreed before the work on the Hatcher No. 2 well that if Re–Entry performed work on Hatcher No. 2, then Cotten would be responsible for Re–Entry's bills; (2) after Re–Entry did the work on Hatcher No. 2, Cotten represented that Re–Entry was going to be paid at some point when Land obtained money through loans or other transactions. Re–Entry asserts that it was damaged by the latter representations because it did not file an affidavit to secure its contractor's lien[2] on the Hatcher lease and thereby receive payment for its unpaid invoices, as did some other contractors. Thus, all actual damages[3] claimed by Re–Entry arise from its failure to receive payment which it contracted to receive for its work on Hatcher No. 2.

## A. LARRY D. COTTEN, INDIVIDUALLY

Cotten does not deny negotiating an agreement for Re–Entry to work on Hatcher No. 2, but claims that the agreement was made on behalf of Land, and not in his individual capacity. He asserts that he always made it clear to Thomas that Land was the principal in the agreement. Cotten's position also is that if Re–Entry did not protect its claim by securing a lien on the Hatcher lease, it was not because Cotten asked or recommended that a lien not be secured, but rather because Re–Entry simply chose not to file an affidavit to secure a lien. Cotten also contests Re–Entry's having proved damages from reliance on any misrepresentations he made after Re–Entry completed its work on Hatcher No. 2.

Re–Entry emphasizes that Cotten was in control of Land, Energy, and Prime, thus he should be liable for breach of contract because of that control, as well as because of his personal agreement for Re–Entry to do the Hatcher No. 2 work. In considering the objective evidence as to whether Cotten is personally liable for breach of contract, however, our focus is not on Cotten's control of the corporations, but on his actions in obtaining Re–Entry's agreement to work on Hatcher No. 2. In this regard, Thomas and Cotten testified as to the original agreement which was made for Re–Entry to work the Hatcher No. 2 well. Their testimony conflicted. Cotten did not dispute that an agreement existed and that Re–Entry was owed money for its work. He testified, however, that he fully disclosed he was acting on behalf of Land in contracting with Re–Entry for the Hatcher No. 2 work. He consistently maintained that he did not negotiate on his own behalf and he never agreed to be responsible for Re–Entry's bills. In contrast, Thomas was unequivocal in his testimony that his agreement for the Hatcher work was with Cotten personally. Thomas testified that he did not agree for Re–Entry to work for Land or

---

**2.** *See* TEX. PROP.CODE ANN. § 56.021 (Vernon 1995).

**3.** Re–Entry also claimed exemplary damages based on appellants' alleged fraud relating to the contract for Re–Entry to provide services on Hatcher No. 2.

any other company on Hatcher No. 2; that he had Re–Entry bill Land because Cotten told him to bill Land; and who Re–Entry billed was Cotten's prerogative because "I'm working for him." Thomas had previously known and worked with Cotten in the oilfield. He moved the Re–Entry rig to the Hatcher lease because he was contacted by Cotten and Felix Thomas, who was working with Cotten. Land and Energy were corporations which had been newly incorporated at the behest of Cotten for the specific purpose of re-entering, drilling and operating wells in Hardeman County. Neither Re–Entry nor Thomas had any prior dealings with or knowledge of Land or Energy.

Thomas' testimony is some evidence that (1) Re–Entry and Cotten agreed for Re–Entry to do work on Hatcher No. 2; (2) Cotten agreed to be responsible for payment to Re–Entry for the work; and (3) Cotten breached the agreement. Further, Cotten's denial that he ever made an agreement to pay for Re–Entry's work is some evidence that he did not intend to perform when he made the agreement. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986). The evidence is legally sufficient to support a finding by the trial court that Cotten defrauded Re–Entry by entering an agreement to pay for its work on Hatcher No. 2 with the intent not to perform. Cotten's acknowledged failure to pay Re–Entry is legally sufficient evidence to support a finding by the trial court of damages to Re–Entry from both breach of contract and fraud.

It was the province of the trial judge sitting as fact finder to resolve conflicts in the evidence. The trial court presumably found that Cotten agreed to pay Re–Entry if Re–Entry would work on Hatcher No. 2, Cotten made such agreement with the intent not to perform, Cotten breached the agreement, and Re–Entry was damaged in the amount of its unpaid invoices as a result of relying on Cotten's representations. After considering the evidence, inferences which may be reasonably drawn from the evidence, and the record as a whole, we do not find the trial court's presumed findings in support of its judgment to be so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. Because we find the evidence to be legally and factually sufficient to support the trial court's judgment against Cotten, individually, on the causes of action for breach of contract and fraud, we need not and do not consider the remainder of Cotten's issues challenging the judgment. TEX.R.APP. P. 47.1.

### B. HARCO ENERGY, INC. AND PRIME WESTERN DEVELOPMENT, INC.

Energy and Prime assert that they were not parties to an agreement for Re–Entry to work the Hatcher No. 2 well, that Cotten was not acting as actual agent for either of them in making the agreement for Re–Entry to work on Hatcher No. 2, that Re–Entry did not rely on Cotten's being an apparent agent for either of them in making the original agreement with Re–Entry, that no misrepresentations were made to Re–Entry after its work on Hatcher No. 2 was completed, and that in any event Re–Entry did not detrimentally rely on any representations made by Cotten on behalf of Energy or Prime after completion of Re–Entry's work on Hatcher No. 2.

Thomas testified that he did not know Energy existed until Re–Entry was already working on Hatcher No. 2. He further testified that he did not look to Energy for payment of Re–Entry's invoices, as his agreement was with Cotten and Re–Entry was working for Cotten. It was Thomas' understanding that Energy was an entity in which Cotten held "his production" from drilling and operating programs. Thomas did not know if Prime Western even existed at the time he made the agreement for Re–Entry to work Hatcher No. 2. Nor did Thomas claim that in making agreements or taking actions on behalf of Re–Entry he at any time relied on Prime or on Cotten's authority to rep-

resent Prime. The only reason Thomas believed Prime had possible liability to Re–Entry was because Cotten possibly owned or had assets in Prime.

Karen Martin (Martin) testified as the President of Re–Entry. Martin's duties with Re–Entry included sending bills and invoices for work done by Re–Entry, then following up to collect unpaid amounts due. She began contacting Cotten in June, 1995, about the unpaid invoices for Hatcher No. 2. By that time Re–Entry had completed its work on Hatcher No. 2. Martin testified that in numerous conversations from June, 1995, through June, 1997, Cotten assured her that "he was going to get us paid." She, like Thomas, did not claim that either Energy or Prime (or Cotten acting for them) made an agreement with Re–Entry to pay Re–Entry's bills, either before Re–Entry began work on Hatcher No. 2 or after the bills became due. Neither Thomas nor Martin claimed that Re–Entry failed to file a lien affidavit to secure its claim for work on the Hatcher lease because Cotten, individually or on behalf of the corporations, or because anyone else on behalf of Energy or Prime asked that a lien not be secured. After reviewing the record, we find the evidence legally insufficient to support a finding that Energy or Prime, because of the actions of Cotten or otherwise, entered a contract with, breached a contract with, or defrauded Re–Entry either as to the original agreement for Re–Entry to work on the Hatcher No. 2 well, or as to subsequent actions or statements. Consequently, Energy and Prime cannot be held liable to Re–Entry for breach of contract or fraud.

■ Nor do we find legally sufficient evidence to support a finding that Re–Entry relied to its detriment on any misrepresentations of Cotten acting as actual or apparent agent of Energy or Prime. Without evidence that Re–Entry relied on a misrepresentation attributable to Energy or Prime and which reliance proximately caused damages other than its contract damages, Re–Entry cannot recover from Energy or Prime on a negligent misrepresentation cause of action. *D.S.A., Inc. v. Hillsboro Indep. School Dist.,* 973 S.W.2d 662, 663–64 (Tex.1998).

■ Re–Entry's pleadings alleged that fraudulent transfers of assets were made by defendants Cotten, Land, Energy, and Prime within the meaning of the UFTA. Appellants urge that termination of the Hatcher lease was not a "transfer" of an asset within the meaning of the UFTA, and that the record contains no evidence to support a finding of the value of the seismic information and Infiniti automobile which were transferred by Land. At oral submission, Re–Entry disclaimed any attempt in this proceeding to cause specific assets allegedly transferred fraudulently by appellants to be subjected to liability for its claims. *See* UFTA § 24.008. In its brief, Re–Entry references four occurrences which it asserts support a finding of and judgment based on fraudulent transfers of assets: (1) Energy allowed its Hatcher lease to expire in August, 1995, and Prime "top leased" the Hatcher lease, thereby allowing Prime to acquire the lease; (2) in October, 1995, Land transferred an Infiniti automobile to Cotten's ex-wife, Virginia Cotten (Virginia); (3) Land transferred seismic data to Energy and Prime; and (4) in October, 1995, Cotten, acting individually and as agent of Land, Energy, and Prime, discharged Land from its position as operator of the Hatcher lease and hired Prime as operator, and also removed Land from its position as operator of a well, to the benefit of Tango Investment, Inc., a corporation owned by Virginia and Cotten's daughter, Ginger.

Regardless of whether allowing a lease to expire and discharging Land as operator of a lease and wells would qualify as "transfers of assets" under the UFTA, we agree with appellants that the record contains no evidence of the value of such "assets." Nor do we find evidence of the value of the Infiniti automobile transferred to Virginia or of the seismic data trans-

ferred by Land. To compound Re–Entry's evidentiary difficulties on its theory of fraudulent transfer of assets, the record contains evidence that the Infiniti was subject to some amount of debt which was assumed by Energy when the vehicle was transferred to Virginia, and evidence that Energy paid for at least some of the seismic information when it was furnished to Land originally. The record does not reflect the amount of debt on the vehicle nor the amounts previously paid by Energy for the seismic information. Without evidence of value of the assets in question, and Land's equity in the assets, a fact finder would have to speculate as to damages, if any, caused to Re–Entry by the actions and transfers referenced. We need not and do not decide if evidence supports a finding that assets were fraudulently transferred under provisions of the UFTA, because even if all the claimed "transfers" were fraudulent transfers of assets within the meaning of the UFTA, the evidence is legally insufficient to support a finding of damages to Re–Entry caused by such transfers. We conclude that Energy and Prime are not liable to Re–Entry for fraudulent transfers of assets under the UFTA.

■ Appellants Energy and Prime assert that article 2.21 of the TCBA preempts any theory of liability against them serving to pierce the corporate veil of Land, such as alter ego or common business enterprise, unless Re–Entry proved they committed an actual fraud resulting in their direct personal benefit. Energy and Prime advance the position that Re–Entry's claim is for a contractual obligation of Land, or that the claim relates to or arises out of such an obligation, and is foreclosed by TBCA art. 2.21. Re–Entry responds that its claim against Energy and Prime for the amounts due from Land is not preempted because it is based on fraud by Energy and Prime. As we have noted above, however, Thomas did not claim that in making the agreement for Re–Entry to work on Hatcher No. 2 he relied on representations by or as to Harco Land, much less Energy or Prime. Martin's testimony does not support a finding of detrimental reliance by Re–Entry on Energy or Prime or on Cotten acting as a representative or agent of either corporation. Re–Entry points out that by a document dated in early 1994, Energy and Prime authorized Land to represent that it owned the Hatcher lease when it did not in fact own the lease. Re–Entry, however, points us to no evidence that it relied to its detriment on a representation by Land that it owned the lease, nor to evidence that Re–Entry even knew of the 1994 document when Re–Entry made its agreement relating to the Hatcher No. 2 work. We find the evidence legally insufficient to support a finding that either Energy or Prime actually defrauded Re–Entry. Therefore, neither Energy nor Prime can be held liable to Re–Entry for the contractual obligations of Land or matters arising from such obligations based on the theories of alter ego, common business enterprise, sham to perpetuate a fraud, or similar theories. TBCA art. 2.21(A), (B); *Menetti v. Chavers,* 974 S.W.2d 168, 174 (Tex.App.—San Antonio 1998, no pet.).

We affirm the trial court's judgment against Larry D. Cotten, individually. We reverse the judgment as to Harco Energy, Inc., and Prime Western Development, Inc., and render judgment that Re–Entry take nothing against Harco Energy, Inc. and Prime Western Development, Inc.