Opinion issued April 19, 2007 













Opinion
issued April 19, 2007 










 

 

 

 




 

 

 

 













 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-05-00787-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



ERIC L. MILLER, Appellant

 

V.

 

RAYTHEON AIRCRAFT COMPANY, RAYTHEON TRAVEL AIR, AND
FLIGHT OPTIONS, L.L.C., Appellees

 

 



On Appeal from the 10th District Court

Galveston County, Texas

Trial Court Cause No. 02CV0990








 

 



O P I N I O N

In this wrongful discharge case, Eric
Miller, an airplane pilot, appeals summary judgments entered in favor of
appellees Raytheon Aircraft Company (RAC), Raytheon Travel Air (RTA), and
Flight Options, L.L.C. (FOC).  Miller
contends (1) summary judgment was improper on his wrongful discharge claims
under the Sabine Pilot[1] exception
to the employment-at-will doctrine, and the trial court erred in considering
hearsay in a summary judgment affidavit, (2) his wrongful discharge claims are
not preempted by the Airline Deregulation Act of 1978,[2] (3)
summary judgment on his breach of contract claims was improper because he was
not an at-will employee, and (4) summary judgment was improper on his common
law tort, conspiracy, and unpaid wages claims. 
We conclude that RAC and RTA established that they terminated Miller’s
employment for a reason other than his refusal to perform illegal acts,
negating the causation required for a Sabine
Pilot claim as a matter of law.  We
further conclude that the Airline Deregulation Act of 1978 preempts Miller’s Sabine Pilot wrongful discharge claim
against FOC.  Finally, the trial court
properly granted summary judgment on Miller’s breach of contract and common law
claims.  We therefore affirm the trial
court’s orders granting summary judgment.

Facts and Procedural History

          RAC
hired Miller in December 1997 and assigned him to work for RTA as a pilot.  RTA was a fractional aircraft ownership
business in which customers would buy a share of an aircraft and pay a monthly
management fee.  Buying a share of an
aircraft entitled the customer to a certain number of flight hours per
year.  RTA managed the aircraft, which
included providing pilots, crew, maintenance, fuel, catering, and scheduling
services.  

          In
December 2001, RTA formed a joint venture with Flight Options, Inc. (FOI), an
RTA competitor.  The venture established
a new company called Flight Options, L.L.C. (FOC).  FOC also engages in a fractional aircraft
ownership business and operates RTA’s former fleet of aircraft.  RTA initially owned a forty-nine percent
interest in FOC, but currently owns a greater than fifty percent interest.  As part of the transaction, RTA ceased flight
operations upon the effective date of the agreement.  

Miller worked for RAC and RTA until
the FOC joint venture commenced on April 1, 2002, whereupon Miller began
working for FOC.  On April 4, just four
days after Miller began work, FOC fired Miller, providing as a basis for its
decision that it had received complaints that he had been abusive to a female flight
attendant, and that he had unnecessarily slowed down an equipment upgrade.  

In this lawsuit, Miller alleges that
he was fired for a different reason. 
According to Miller’s affidavit, as a pilot, he was responsible for
ensuring that any aircraft he was assigned to fly was fit for service in
accordance with the RTA Flight Operations Manual and Federal Aviation
Administration (FAA) regulations. 
Generally, FAA regulations require that all systems and components on an
aircraft be operative.  An aircraft,
however, may nonetheless be dispatched for a flight, or may continue a flight,
with certain systems and components inoperative, provided the aircraft has an
approved Minimum Equipment List (MEL), and is operated in accordance with the
procedures and limitations prescribed by the MEL.  Miller alleges that throughout his employment
at RAC and RTA, his superiors requested and pressured him to continue flight
operations with aircraft that had maintenance problems that required their
grounding in accordance with their published MELs.  Miller further alleges that he was fired
because he refused to fly these aircraft, citing five occasions when he
grounded aircraft that did not meet MEL standards.  

          In
addition to a Sabine Pilot wrongful
discharge claim, Miller seeks recovery for breach of employment contract,
promissory estoppel, fraud, negligent misrepresentation, civil conspiracy,
intentional infliction of emotional distress, negligence, and wage and hour
violations.  

Wrongful Discharge—RAC and RTA  

A. 
Affidavit of William Wallisch

          At
the outset, Miller contends the trial court abused its discretion in denying
his motion to strike the affidavit of William Wallisch, an RTA Vice President,
in its entirety.  The trial court struck
the portion of Wallisch’s affidavit that stated that Miller’s employment with
RTA was “at-will,” but refused to strike the remainder of the affidavit.  Miller contends that the affidavit fails to
demonstrate that Wallisch is competent to offer testimony concerning Miller’s employment
status.  Miller also contends that
Wallisch’s statement in the affidavit referencing an un-appended combination
agreement constitutes hearsay.  Miller
directs us to Texas Rule of Civil Procedure 166a(f), which provides: “Supporting
and opposing affidavits shall be made on personal knowledge, shall set forth
such facts as would be admissible in evidence, and shall show affirmatively
that the affiant is competent to testify to the matters stated therein.”  Tex.
R. Civ. P. 166a(f).  

We review a trial court’s decision to admit or
exclude summary judgment evidence for an abuse of discretion.  Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex.
1998); United Blood Servs. v. Longoria, 938 S.W.2d 29, 30 (Tex. 1997).  The standards for the admissibility of evidence
in a summary judgment proceeding are the same as those applicable to a regular
trial.  Longoria, 938 S.W.2d at 30.  In an abuse of discretion review, we consider
whether the trial court acted arbitrarily or unreasonably, or without reference
to guiding rules and principles.  Downer
v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241–42 (Tex. 1985).  To warrant a reversal, the trial court’s
error must have probably caused rendition of an improper judgment.  Tex.
R. App. P. 44.1(a)(1).

1.  Competence

Miller contends Wallisch’s affidavit
failed to demonstrate that he was competent to offer testimony concerning
Miller’s employment status.  Wallisch’s affidavit states:

1. My name is William Wallisch.  I am over twenty-one years of age, and I am
competent to make this Affidavit.  All
matters stated herein are true and correct and within my personal knowledge.

 

2. I am currently the Vice President and
Controller for Raytheon Aircraft Parts & Inventory Distribution.  From April 1997 through August 2002, I served
as the Vice President, Finance of Raytheon Travel Air Company.

 

          Rule 166a(f) requires an affiant to affirmatively show that he is competent to
testify to the matters stated in an affidavit.  Tex.
R. Civ. P. 166a(f).  The affidavit must affirmatively demonstrate how the affiant is competent to testify.  Jackson T. Fulgham Co. v. Stewart Title Guar. Co., 649 S.W.2d 128, 130 (Tex. App.—Dallas 1983,
writ ref’d n.r.e.).  “The
personal knowledge requirement is satisfied if the affidavit sufficiently
describes the relationship between the affiant and the case so that it may be
reasonably assumed that the affiant has personal knowledge of the facts stated
in the affidavit.”  Stucki v. Noble, 963
S.W.2d 776, 780 (Tex. App.—San Antonio 1998, pet. denied).

Here, the assertion in
Wallisch’s affidavit that he was Vice President of Finance at RTA from 1997
until 2002 demonstrates a basis for personal knowledge concerning Miller’s
employment status.  We have held that
such an assertion is sufficient to demonstrate personal knowledge and
competence to testify.  See Waite v. BancTexas-Houston, N.A.,
792
S.W.2d 538, 540–41 (Tex. App.—Houston [1st Dist.] 1990, no writ); see
also Equisource Realty Corp. v. Crown Life Ins. Co., 854 S.W.2d 691, 695
(Tex.
App.—Dallas 1993, no writ); Jackson T. Fulgham Co., 649 S.W.2d at 130.  Accordingly, we hold that the factual
assertions in Wallisch’s affidavit demonstrate his competence to
testify about Miller’s employment status at RTA.  

2.  Hearsay

Miller also contends that Wallisch’s
statement in the affidavit referring to the combination agreement creating FOC
constitutes hearsay.  Specifically,
Miller objects to the portion of Wallisch’s affidavit that states, “although,
pursuant to the parties’ agreements, the pilots would be under the operational
control of Flight Options, L.L.C. between March 20, 2002 and April 1,
2002.”  RAC and RTA respond that the statement
regarding the terms of the agreement constitutes a statement of operative
facts, and is therefore not hearsay.  

To obtain reversal of a judgment based on error
in the admission or exclusion of evidence, an appellant must show that the
trial court’s ruling was erroneous and that the error was calculated to cause,
and probably did cause, “rendition of an improper judgment.”  Tex.
R. App. P. 44.1(a)(1); Malone, 972 S.W.2d at 43; Benavides v. Cushman, Inc., 189
S.W.3d 875, 879 (Tex.
App.—Houston
[1st Dist.] 2006, no pet.).  In making this determination, we review the
entire record.  City of Brownsville v.
Alvarado, 897 S.W.2d 750,
754 (Tex.
1995).  Reversible error does not usually
occur in connection with evidentiary rulings unless the appellant can
demonstrate that the whole case turns on the particular evidence admitted or excluded.  Id. at 753–54; Benavides,
189 S.W.3d at 879; GT
& MC, Inc. v. Tex. City Ref., Inc., 822 S.W.2d 252, 257
(Tex. App.—Houston [1st Dist.] 1991, writ denied).  

Here, Miller included a
copy of the combination agreement in his summary judgment evidence.  Given that the agreement was present
in the record, we hold that Miller could not be harmed by error, if any, in the
trial court’s admission of the statement in Wallisch’s affidavit.  See Tex. R. App. P. 44.1(a)(1); GTE Sw., Inc. v. Bruce, 998 S.W.2d 605, 619–20
(Tex. 1999) (holding that trial court’s error in admitting expert testimony as
to whether defendant’s conduct was extreme and outrageous was harmless because expert
testimony was cumulative of abundant evidence at trial showing that his conduct
was extreme and outrageous);
Fairmont
Supply Co. v. Hooks Indus., Inc., 177 S.W.3d 529, 532 (Tex.
App.—Houston [1st Dist.] 2005, pet. denied) (holding that any error in
admission of evidence was harmless because it was cumulative).

B.  Wrongful Discharge

Miller contends the trial court erred
in granting RAC and RTA’s traditional motion for summary judgment on his
wrongful discharge claims because RAC and RTA did not establish as a matter of
law that Miller was terminated for reasons other than his refusal to fly
aircraft in violation of FAA regulations.

We review a summary judgment de
novo.  Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005); Provident Life & Accident Ins.
Co. v. Knott, 128
S.W.3d 211, 215 (Tex. 2003).  Under the traditional standard for summary
judgment, the movant has the burden to show that no genuine issue of material
fact exists and that the trial court should grant a judgment as a matter of
law.  Tex.
R. Civ. P. 166a(c); KPMG Peat
Marwick v. Harrison
 County Hous. Fin.
Corp., 988 S.W.2d 746, 748 (Tex.
1999).  In our review, we take as true all
evidence favorable to the nonmovant, and we indulge every reasonable inference
and resolve any doubts in the nonmovant’s favor.  Dorsett, 164 S.W.3d at 661.  

In Texas,
absent a specific agreement to the contrary, an employer may fire an employee
at will for good cause, bad cause, or no cause at all.  Montgomery County Hosp.
Dist. v. Brown, 965 S.W.2d 501, 502 (Tex. 1998).  In Sabine Pilot Service, Inc. v. Hauck, the Texas Supreme Court recognized
an exception to the employment-at-will doctrine for an employee discharged “for
the sole reason that the employee refused to perform an illegal act.”  687 S.W.2d 733, 735 (Tex.
1985); see also Winters v. Houston
Chronicle Publ’g Co., 795 S.W.2d 723, 724 (Tex. 1990).  The court held that a plaintiff has the burden
to prove by a
preponderance of the evidence that his discharge was for the sole reason that
he refused to perform an illegal act that he reasonably believed would subject
him to criminal penalties.  Sabine Pilot, 687 S.W.2d at 735; see also City
of Midland v. O’Bryant,
18
S.W.3d 209, 215 (Tex. 2000); Winters, 795 S.W.2d at 724.  The Sabine Pilot exception applies when
an employee has been unacceptably forced to choose between risking criminal
liability or being discharged from his livelihood.  See Winters, 795 S.W.2d at 724.  An employer who discharges an employee both
for refusing to perform an illegal act and for a legitimate reason cannot be
liable for wrongful discharge—the refusal must be the sole cause for the
employee’s termination.  Tex. Dep’t of Human Servs. v. Hinds, 904 S.W.2d 629, 633 (Tex. 1995); McClellan v. Ritz-Carlton Hotel
Co., 961 S.W.2d 463, 464 (Tex. App.—Houston [1st Dist.] 1997, no
pet.).

The evidence is
undisputed that RAC and RTA terminated each and every one of their 500 pilots
when RTA ceased its operation of the fractional aircraft ownership
business.  The master transaction
agreement creating FOC provides:

4.5 Employees.  Prior to the Closing Date, the Parties will
identify the employees of [FOI] and [RTA] that are to be offered employment
with [FOC] as of the Closing Date and shall make a formal offer of employment
to each such Person and shall inform each such Person of the compensation and
benefits for which such Person will be eligible as an employee of [FOC].

 

In his affidavit, William Wallisch
states, 

4. On March 20, 2002, Travel Air combined certain of
its assets and liabilities with certain assets and liabilities of its
competitor Flight Options, Inc., in order to form a separate legal entity,
Flight Options, L.L.C.

 

5. Although Travel Air did not cease to exist as a
result of this transaction, it ceased its operation of fractionally-owned
aircraft.  As a result, the services
rendered by the pilots who were employed by Travel Air were no longer
necessary, and the employment of Travel Air pilots was officially terminated on
or about April 1, 2002 (although, pursuant to the parties’ agreements, the
pilots would be under the operational control of Flight Options, L.L.C. between
March 20, 2002 and April 1, 2002).

 

Miller accepted an offer of
employment from FOC in February of 2002.  RAC executed a termination of employment form
on April 2, 2002 that states that Miller’s employment was voluntarily
terminated because he obtained another job due to the “[m]erger of Raytheon
Travel Air and Flight Options.”    

This evidence establishes as a matter
of law that RAC and RTA terminated the employment of all their pilots, including
Miller, because of the creation of FOC and the cessation of RTA’s fractional
aircraft ownership business.  See Bell v. Specialty Packaging Prods., 925 F. Supp. 475, 477 (W.D. Tex. 1994) (holding that
because reduction in work force at her plant was at least one reason for
plaintiff’s termination, her Sabine Pilot claim failed); cf. McClellan,
961 S.W.2d at 464–65 (holding defendant failed to prove as matter of law at
least one legitimate reason for terminating plaintiff’s employment).  An employer who discharges an employee for reasons other
than the refusal to perform an illegal act cannot be liable for wrongful
discharge under Sabine Pilot.  See Hinds, 904 S.W.2d at 633; McClellan, 961 S.W.2d at 464. 
The trial court therefore properly granted RAC and RTA’s summary
judgment on Miller’s Sabine Pilot
claims.

Preemption

          In
his second issue, Miller contends the trial court erred in granting FOC’s summary judgment on
his Sabine Pilot wrongful discharge
claim because the claim is not preempted by the Airline Deregulation Act of
1978 (ADA).[3]

A.  General
Preemption Law

Federal preemption of state law is grounded in
the Supremacy Clause of the United States Constitution, which provides that “the
Laws of the United States . . . shall be the supreme Law of the Land; and the
Judges in every State shall be bound thereby, any Thing in the Constitution or
Laws of any State to the Contrary notwithstanding.”  U.S.
Const.
art. VI, cl. 2; Delta Air Lines, Inc. v. Black, 116 S.W.3d 745, 748
(Tex. 2003).  Under the Supremacy Clause, if a state law
conflicts with federal law, the state law is preempted and will have no effect.
 Maryland
v. Louisiana, 451 U.S.
725, 746, 101 S. Ct. 2114, 2128–29
(1981); Black, 116 S.W.3d at 748.  

“Preemption can take one of several forms.”  Black, 116
S.W.3d at 748.  A federal law may expressly preempt a state
law.  Id.; Great Dane
Trailers, Inc. v. Estate of Wells,
52 S.W.3d 737, 743 (Tex. 2001).  A federal law may also preempt a state law
impliedly, “either (i) when the scheme of federal regulation is sufficiently
comprehensive to support a reasonable inference that Congress left no room for
supplementary state regulation or (ii) if the state law actually conflicts with
federal regulations.”  Black,
116
S.W.3d at 748;
Great Dane Trailers, 52
S.W.3d at 743.  A state law presents an
actual conflict when a party cannot comply with both state and federal
regulations, or when the state law would obstruct Congress’ purposes and
objectives.  Black, 116 S.W.3d at 748; Great Dane Trailers, 52 S.W.3d at 743.

The purpose of Congress is the ultimate
touchstone in every preemption case.  Retail
Clerks Int’l Ass’n v. Schermerhorn,
375 U.S. 96, 103, 84 S. Ct. 219, 222–23 (1963); Black, 116 S.W.3d at 748.  We discern congressional intent primarily
from the statute’s language and structure. 
Medtronic, Inc. v. Lohr,
518 U.S. 470, 486, 116 S. Ct. 2240, 2250–51 (1996);
Black, 116 S.W.3d at 748.  Also relevant is the purpose of the statute
as a whole, which is revealed through “the reviewing court’s reasoned
understanding of the way in which Congress intended the statute and its
surrounding regulatory scheme to affect business, consumers, and the law.”  Lohr,
518 U.S. at 486, 116 S. Ct. at 2251;
Black, 116 S.W.3d at 748–49.  

B.  Airline Deregulation Act

In 1978, Congress deregulated the
airline industry by enacting the ADA.  See Morales v. Trans World Airlines,
Inc., 504 U.S.
374, 378, 112 S. Ct. 2031, 2034
(1992); Black,
116
S.W.3d at 749.  The ADA is designed to promote “maximum reliance on
competitive market forces,” while at the same time “assigning and maintaining
safety as the highest priority in air commerce.”  49 U.S.C. § 40101(a) (2000); Am.
Airlines, Inc. v. Wolens, 513 U.S.
219, 230, 115 S. Ct. 817, 824
(1995).  To ensure that the states would
not compromise federal deregulation by promulgating regulations of their own,
the ADA contains a preemption
provision.  49 U.S.C. § 41713(b)(1) (2000); Morales, 504 U.S.
at 378–79, 112 S. Ct. at 2034. 
The ADA’s preemption
provision provides: 

Except as provided in this subsection, a
State, political subdivision of a State, or political authority of at least 2
States may not enact or enforce a law, regulation, or other provision having
the force and effect of law related to a price, route, or service of an air
carrier that may provide air transportation under this subpart.

 

49 U.S.C. § 41713(b)(1).  

1.  Morales and Wolens

In Morales v. Trans World Airlines, Inc., the United State Supreme Court examined whether the ADA preempted the enforcement of guidelines
concerning regulation of airline fare advertising through Texas’s consumer protection statutes.  504 U.S.
at 378–80, 112 S. Ct. at
2034–35.  Relying on its ERISA line of
cases and the ordinary meaning of the words of the statute, the Court construed
the phrase “related to” broadly to preempt state enforcement actions “having a connection with or
reference to” airline rates, routes, or services.  Id. at 384, 112 S. Ct.
at 2037.  The Court also held that the
preemption provision could apply to laws of general applicability that do not
specifically reference the airline industry. 
Id.
at 386, 112 S. Ct. at 2038.  While the Court acknowledged that some state
actions might affect airline fares in too tenuous, remote, or peripheral a
manner to be preempted, it concluded that the obligations imposed by the advertising
guidelines would affect the airlines’ ability to market their product and the
fares they charged.  Id. at
390, 112 S. Ct. at 2040.  The advertising guidelines therefore had a
“forbidden significant effect” on the airlines’ rates, routes, and services
because they restricted fare advertising, which relates to rates.  Id.
at 388–89, 112 S. Ct. at 2039.  The Court held the ADA
preempted the fare advertising guidelines in the state consumer protection
statutes at issue.  Id. at 391, 112 S. Ct. at 2041.

          In American Airlines,
Inc. v. Wolens, the United States Supreme Court again addressed the ADA’s preemption clause.  513 U.S.
at 227–28, 115 S. Ct. at 823–24.  Wolens
involved state law
consumer fraud and breach of contract claims arising from retroactive changes
in an airline’s frequent flyer program.  Id. at 224–25, 115 S.
 Ct. at 822.  The Court focused on the preemption clause
phrase, “enact or enforce any law,” to determine the ADA’s
preemptive scope.  Id.
at 226, 228–29, 115 S. Ct. at 823–24.  The Court held that, like the
guidelines at issue in Morales,
the ADA preempted Illinois’s consumer fraud statute because the
statute “serve[d] as a means to guide and police the marketing practices of the
airlines.”  Id.
at 228, 115 S. Ct. at 823–24.  

The Wolens Court
next turned to whether the ADA
preempted the plaintiffs’ breach of contract claims.  Id. at 228, 115 S. Ct. at 824. 
The Court held that the ADA’s
preemption clause did not shield airlines from “suits alleging no violation of
state-imposed obligations, but seeking recovery solely for the airline’s
alleged breach of its own, self-imposed undertakings.”  Id.
 The Court reasoned that
the contract at issue was a privately ordered obligation, and did not amount to
a state’s enactment
or enforcement of a state law, rule, regulation, standard, or other provision.  Id. at 228–29, 115 S. Ct. at 824; see
also 49 U.S.C. § 41713(b)(1).  The Court limited its holding,
however, to suits based on the terms of the parties’ bargain, “with no
enlargement or enhancement based on state laws or policies external to the
agreement.”  Id.
at 233, 115 S. Ct. at 826.  Courts have
interpreted this to mean that if a court cannot adjudicate a contract claim
without resort to external law, the ADA
preempts the claim.  See, e.g., Smith v. Comair, Inc., 134 F.3d 254, 257 (4th
Cir. 1998); Black, 116 S.W.3d at 750; Boon Ins. Agency, Inc.
v. Am. Airlines, Inc., 17 S.W.3d 52, 58–59
(Tex. App.—Austin 2000, pet. denied).  Additionally, the Wolens Court suggested
that the ADA’s preemption provision
should be read in light of the ADA’s
overarching deregulatory purpose, and should be interpreted to mean that states
may not seek to impose their own public policies or theories of competition or
regulation on the operations of an air carrier. 
See 513 U.S.
at 229 n.5, 115 S. Ct. at 824 n.5.

 

2.  Kiefer and Black

The Texas Supreme Court first addressed
preemption under the ADA in Continental
Airlines, Inc. v. Kiefer.  920 S.W.2d 274, 275 (Tex. 1996). 
The court applied a two-part analysis to determine whether the ADA preempted the plaintiffs’ personal injury negligence
claims.[4]  Id. at 281–82.  First, the court examined whether the claims
related to airline rates, routes, or services. 
Id. at 281.  Second, the court examined whether the claims
constituted the enactment or enforcement of a state law, rule, regulation,
standard, or other provision.  Id.  The court concluded that, although the
plaintiffs’ negligence claims clearly related to the airline’s services, the
claims did not amount to the enforcement of a state law and therefore were not
preempted.  Id.
at 282.  The court noted that, unlike the
state consumer protection legislation at issue in Morales, negligence actions do not “carry the
same ‘potential for intrusive regulation of airline business practices 
. . . .’”  Id.
(quoting Wolens, 513 U.S. at 227, 115 S. Ct.
at 823).  The court, however, cautioned that, depending
on the nature and extent of damages sought, even simple negligence actions may
constitute an impermissible regulation of the airline industry through state
tort law.  Id.  In making its decision, the court focused on the
extent to which the negligence claims threatened to encroach on the
congressional objective of airline deregulation, instead of categorically
declaring that the ADA always
exempts personal injury claims from preemption.  Id.;
see also Black, 116 S.W.3d at 751.

In 2003, The Texas Supreme Court
again addressed preemption under the ADA
in Delta Air Lines, Inc. v. Black.  116 S.W.3d at 747.  In Black, the
plaintiff and his spouse purchased first-class seats on a Delta flight for a trip
to Las Vegas.
 Id.  When
the couple arrived at the airport, Delta denied the spouse a first-class seat
because the flight was overbooked.  Id.  The plaintiff then sued Delta for breach of
contract, fraud, and negligent misrepresentation.  Id. at 748.
 Delta asserted that the ADA
preempted the plaintiff’s claims.  Id.  

The Texas Supreme Court applied the two-part
analysis from Kiefer and
examined whether the plaintiff’s contract claims related to airline prices,
routes, or services, and
whether the claims constituted the enactment or enforcement of a state law,
regulation, or other provision.  Id. at 752–54.  The court also examined cases from the Ninth
and Fifth Circuits to determine the meaning of the term “services” in the ADA’s preemption clause.  Id. at 752; see also Charas v. Trans World
Airlines, Inc., 160 F.3d
1259, 1261 (9th Cir. 1998) (narrowly defining services as “the prices, schedules,
origins and destinations of the point-to-point transportation of passengers,
cargo, or mail”); Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336 (5th Cir. 1995) (broadly defining services to
include “ticketing, boarding procedures, provision of food and drink, and
baggage handling, in addition to the transportation itself”).  While the court did not articulate its own
definition of services, it concluded that claims involving boarding and seating
procedures fall within most courts’ definitions of services, including the
Ninth and Fifth Circuits’.  Black, 116 S.W.3d at 753.  The
court therefore held that the plaintiff’s contract claims related to Delta’s services.  Id.; see also Wolens, 513 U.S. at 226, 115 S. Ct.
at 823 (noting that services includes “access to flights and class-of-service
upgrades”).  The court stated that,
unlike the frequent flyer program in Wolens,
“seating policies and boarding procedures are not peripheral to the operation
of an airline, but are inextricably linked to the contract of carriage between
a passenger and the airline and have a definite ‘connection with, or reference
to’ airline services.”  Black, 116 S.W.3d at 753 (quoting Morales,
504 U.S. at 384, 112 S. Ct. at  2037).

The court also concluded that the plaintiff’s
contract claims, if allowed to proceed, would constitute state enforcement or
enactment of a state law under the preemption provision of the ADA.  See id. at 756.  The court discussed the fact that the alleged
contractual violations in the case involved a common condition unique to the
airline industry—the failure to seat an allegedly confirmed ticket holder
because of overbooking—and that unlike the frequent flyer agreements at issue
in Wolens, specific federal
regulations govern compensation for air passengers who are involuntarily
prevented from boarding a flight due to overbooking.  Id.; see also 14 C.F.R. §§ 250.1–250.9 (2000)
(requiring airlines to pay compensation to any passenger who is involuntarily
denied boarding caused by oversold flight, and allowing passenger to decline
payment and recover damages in court of law, unless passenger is offered
accommodations or is seated in section of aircraft other than that specified on
ticket at no extra charge).  Delta had
incorporated these federal regulations into its contract.  Under the federal regulations, the plaintiff
would not have been entitled to sue Delta for breach of contract because the
plaintiff and his spouse were not involuntarily denied boarding—Delta offered
to seat them “in a section of the aircraft other than that specified on the
ticket at no extra charge . . . .”  Black, 116 S.W.3d at 755–56; see also 14 C.F.R. § 250.6(c).  The court noted that the specific federal
regulations had a national purpose in that they provided a uniform system of
compensation to passengers.  Black, 116 S.W.3d at 756.  The
court stated that, “[i]f passengers were permitted to challenge airlines’ boarding
procedures under state common law, the airline industry would potentially be
subject to regulation by fifty different states.”  Id.  The
court held that the ADA preempted
the plaintiff’s contract claims because the court could only adjudicate the
claims by reference to laws and policies external to the contract.  Id.       

C.  Air Carrier Status

Miller contends the ADA does not apply to this case because FOC did not
establish as a matter of law that it is an “air carrier,” as defined by the ADA.  49 U.S.C. § 40102(a)(2) (2000).  

The ADA’s preemption provision applies only to laws or
regulations that affect air carriers.  Id. § 41713(b)(1).  Under the ADA,
“air carrier” is defined as “a citizen of the United
 States undertaking by any means, directly or indirectly, to
provide air transportation.”  Id. §
40102(a)(2).  “[A]ir transportation” means “foreign air
transportation, interstate air transportation, or the transportation of mail by
aircraft.”  Id. §
40102(a)(5).  “[I]nterstate air
transportation” means “the transportation of passengers or property by aircraft
as a common carrier for compensation . . . .”  Id. § 40102(a)(25).  A “citizen of the United States” can be “a
corporation or association organized under the laws of the United States or a
State, the District of Columbia, or a territory or possession of the United
States . . . .”  Id. § 40102(a)(15)(C)
(Supp. III 2003).     

          FOC produced a certificate from the FAA certifying its
status as an air carrier.  See 14 C.F.R. § 119.5(a) (2000) (“A
person authorized by the Administrator to conduct operations as a direct air
carrier will be issued an Air Carrier Certificate.”).  Miller did not produce any contrary evidence
to raise a fact issue.  FOC has therefore
established as a matter of law its status as an air carrier under the ADA.[5]  

D.  ADA Preemption of Miller’s Sabine Pilot Claim

          In determining whether the ADA
preempts Miller’s Sabine Pilot claim
against FOC, we apply the Texas Supreme Court’s two-part analysis from Kiefer. 
Kiefer, 920 S.W.2d at 281–82.

We begin with the question of whether Miller’s Sabine Pilot wrongful discharge claim is
related to FOC’s prices, routes, or services. 
See id. at 281.  Miller’s Sabine
Pilot claim authorizes a suit for wrongful discharge when FOC terminated
his employment allegedly for refusing to fly aircraft that did not meet FAA
regulations.  See 687 S.W.2d at 735.  It is
undisputed that Miller’s refusals to pilot aircraft resulted in the grounding
of the aircraft.  Grounding aircraft
directly affected FOC’s point-to-point transportation services.  While some variation has arisen among the
courts regarding the definition of the term “services” under the ADA, every court attempting to define the term has
included point-to-point transportation within its definition as a bargained-for
aspect of air travel.  See Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1257 (11th Cir.
2003) (adopting Fifth Circuit definition of services, which includes
transportation itself); Botz v. Omni Air
Int’l, 286 F.3d 488, 495 (8th Cir. 2002) (holding
flight attendant’s refusal to violate federal law by exceeding work hour
maximum affected air carrier’s services because aircraft could not fly without
her); Duncan v. Nw. Airlines, Inc., 208 F.3d
1112, 1114–15 (9th Cir. 2000) (holding
that service
refers to provision of air transportation to and from various markets at
various times), cert. denied, 531 U.S. 1058, 1058, 121
S. Ct. 650, 650–51 (2000) (O’Connor, J., dissenting) (noting various
definitions of term “services” under ADA and need to resolve this conflict
between circuit courts); Charas, 160 F.3d at 1261
(defining services to include point-to-point transportation of passengers,
cargo, or mail); Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1433 (7th Cir. 1996)
(defining services to include transportation itself); Hodges, 44 F.3d at 336 (defining services
to include transportation itself); Black,
116 S.W.3d at 752 (citing service definitions from Hodges and Charas).  Given the United States Supreme
Court’s broad interpretation of the phrase “related to,” we hold that Miller’s Sabine Pilot claim relates to FOC’s
point-to-point transportation services.  See 49 U.S.C. § 41713(b)(1); Morales, 504 U.S.
at 384, 112 S. Ct. at 2037 (defining
phrase “related to” broadly to preempt state enforcement actions having
connection with or reference to airline rates, routes, or services).  

The second inquiry under the Kiefer analysis is whether Miller’s Sabine Pilot wrongful discharge claim
constitutes the enforcement of a state law, regulation, or other provision
within the meaning of the ADA’s
preemption clause.  See Kiefer, 920 S.W.2d at 281.  Unlike a simple negligence claim, or a
contract claim involving only obligations voluntarily undertaken by an air
carrier, a Sabine Pilot wrongful
discharge claim embodies state public policy. 
See Wolens, 513 U.S. at
232–33, 115 S. Ct. at 826; Kiefer, 920 S.W.2d at 282.  A Sabine
Pilot claim represents a policy determination by the State of Texas that an employee terminated for refusing to
perform a criminal act should have a tort action against his employer.  See 687
S.W.2d at 735 (“We now hold that public policy, as expressed in
the laws of this state and the United States
which carry criminal penalties, requires a very narrow exception to the
employment-at-will doctrine announced in East Line & R.R.R. Co. v. Scott.”). 
Under the facts of this case, Sabine
Pilot would allow Miller to seek money damages in state court when he chose
to ground aircraft and suffered termination of his employment as a consequence.  State enforcement of Miller’s Sabine Pilot claim therefore imposes
state policies on the point-to-point transportation services of FOC.  See
Black, 116 S.W.3d at 757.  “A state’s
common law cannot operate against an airline in this context when it would
constitute state enforcement of a law relating to airline services.”  Id.; see also Morales, 504 U.S. at 383–84, 112 S. Ct.
at 2037.  Contrary to the ADA’s purpose, Miller’s Sabine Pilot claim has the potential to impose state regulation on FOC’s
business practices and transportation services. 
See Wolens, 513 U.S.
at 227–28, 115 S. Ct. at 823; Black, 116 S.W.3d at 754; Kiefer, 920 S.W.2d at 282.  This is true despite the fact that the ADA and the Sabine
Pilot claim alleged here have consistent goals: compliance with federal
regulations and airline safety.  The ADA’s preemption provision displaces all state laws
that fall within its sphere, regardless of whether the state law is consistent
or inconsistent with the ADA’s
purposes and objectives.  Morales, 504 U.S.
at 386–87, 112 S. Ct. at 2038.
 Accordingly, we hold that the ADA preempts Miller’s Sabine Pilot claim because the claim relates to the transportation
services FOC provides, and if allowed, would amount to the enactment or
enforcement of a state law.[6]  

The Eighth Circuit’s
decision in Botz v. Omni Air
International supports our decision in this case.  286 F.3d at 495.  In Botz,
Omni Air International terminated Anna Botz’s employment as a flight attendant
after she refused a flight assignment that she believed violated federal safety
regulations.  Id. at 489.  Botz sued Omni under a Minnesota
whistleblower statute.  Id.  Omni asserted that the ADA
preempted Botz’s claim because the claim was related to Omni’s point-to-point
transportation services.  Id. at
490, 492.  The court agreed, reasoning
that Botz’s whistleblower claim allowed her to refuse assignments without fear
of retaliation.  Id. at 494.  Refusal of an assignment could potentially
disrupt Omni’s transportation services because federal law requires a certain
number of flight attendants on each flight. 
See id. 

The Eleventh Circuit’s decision in Branche v. Airtran Airways, Inc. uses a
similar analysis but applies it to different facts.  342 F.3d at 1252.  In Branche,
Airtran Airways terminated Michael Branche’s employment as a safety inspector
after he reported Airtran’s violations of federal law to the FAA.  Id.  Branche sued Airtran under a Florida whistleblower statute.  Id.  Airtran asserted that the ADA preempted Branche’s claim because the claim was
related to Airtran’s services.  Id.  The court adopted the Fifth Circuit’s
definition of services from Hodges v.
Delta Airlines, Inc., and held that only air carrier services having a
connection with or reference to the elements of air travel that are bargained
for by passengers are preempted by the ADA. 
Id. at 1257–58; Hodges, 44 F.3d at 336 (“Elements of the air carrier service bargain include items
such as ticketing, boarding procedures, provision of food and drink, and
baggage handling, in addition to the transportation itself.”).  Branche’s claim did not relate to Airtran’s
services.  Branche, 342 F.3d at 1257.  The
court stated, “[a]lthough some safety-related claims
may be tied to air carrier services, the very fact that they concern safety,
standing alone, is insufficient to demonstrate this nexus.”  Id. at 1260.  In discussing Botz, the court stated:

As for the connection between retaliatory
discharge claims and airline services, we do not dispute the Eight Circuit’s
conclusion that the grounding of an airplane is related to airline services, in
particular, the transport of passengers from one place to another.  However, in this case, the connection—or,
indeed, the potential connection—between Branche’s actions and air carrier
services is far more attenuated than in Botz.  As the Eighth Circuit
said, if a flight attendant refuses to fly and a replacement cannot be found,
FAA regulations prevent the plane from leaving the gate, thereby disrupting
service.  Here, by contrast, we are not
concerned with the withdrawal of clearance for a plane to take off based on
mechanical concerns, but instead only with Branche’s post hoc reporting
of a FAA violation. . . .  Had Branche
claimed that Airtran fired him in retaliation for refusing to allow a plane to
take off due to safety concerns, this would present a situation closer to the
one at issue in Botz.  But that is
not the claim before us.

 

Id. at 1262–63.

Factually, our case is closer to Botz than it is to Branche.  Id.; Botz,
286 F.3d at 494–95.  Miller’s Sabine Pilot claim is preempted because
he alleges that he refused to pilot aircraft and was fired for it, and the Sabine Pilot claim subjects his employer
to state law liability for firing a pilot for his refusal to fly.  Unlike a post hoc report of a violation as in
Branche, or a refusal to perform an
illegal act unrelated to actual air flight, Miller’s claim directly impinges on
the provision of air carrier services.  See Sabine Pilot, 687 S.W.2d at 735.  We therefore hold
that the trial court properly granted FOC’s summary judgment on Miller’s Sabine Pilot wrongful discharge
claim.  

We note the limited
applicability of our holding.  The ADA would not preempt a Sabine Pilot claim against an air carrier that is not related to
the air carrier’s prices, routes, or services. 
See 49 U.S.C. § 41713(b)(1).

Contract Claims

In his fourth issue, Miller contends the trial court erred in granting
summary judgment on his breach of contract claims.  RAC and RTA attacked the breach of contract
claims with a no-evidence motion for summary judgment, while FOC filed a
traditional motion for summary judgment.

A.  RAC and
RTA’s Summary Judgment

          In their no-evidence motion for summary judgment, RAC and
RTA contended that Miller produced no evidence that an employment contract
existed.  A contract that alters the
at-will employment relationship must “unequivocally indicate [the employer’s]
definite intent to be bound not to terminate the employee except under clearly
specified circumstances.”  Brown, 965 S.W.2d at 502; see also Midland Judicial Dist. Cmty. Supervision & Corr. Dep’t v. Jones,
92 S.W.3d 486, 487 (Tex. 2002).

In a Rule 166a(i)
no-evidence summary judgment, the movant represents that no evidence exists as
to one or more essential elements of the non-movant’s claims, upon which the
non-movant would have the burden of proof at trial.  Tex.
R. Civ. P. 166a(i).  The non-movant then must
present evidence raising a genuine issue of material fact on the challenged
elements.  Id.  A no-evidence summary judgment is essentially
a pre-trial directed verdict.  Bendigo v.
City of Houston, 178 S.W.3d 112, 113–14
(Tex. App.—Houston [1st Dist.] 2005, no pet.); Jackson v. Fiesta Mart, Inc., 979 S.W.2d 68,
70–71 (Tex. App.—Austin 1998, no pet.). 
On review, we ascertain whether the non-movant produced more than a
scintilla of probative evidence to raise a genuine issue of material fact.  Jackson, 979 S.W.2d at
70–71.  More than a scintilla of evidence
exists if the evidence “‘rises to a level that would enable reasonable and
fair-minded people to differ in their conclusions.’”  King
Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex.
2003) (quoting Merrell Dow Pharm., Inc.
v. Havner, 953 S.W.2d 706, 711 (Tex.
1997)).  If the evidence does no more
than create a mere surmise or suspicion of fact, less than a scintilla of
evidence exists.  Chapman, 118 S.W.3d at 751. 
To defeat a no-evidence motion for summary judgment, the respondent is
not required to marshal its proof; its response need only point out evidence
that raises a fact issue on the challenged elements.  Tex.
R. Civ. P. 166a(i) cmt.   

          Miller
received a letter from RAC in November of 1997 offering him employment as a
pilot.  Miller accepted the offer by
signing the last page of the letter, as requested by RAC.  Miller asserts that as a government
contractor, RAC promised that it would employ Vietnam
veterans and advance them in employment. 
See 38 U.S.C. § 4212(a)(1) (Supp.
III 2003).  Miller indicated on his RAC
employment application that he wanted to participate in the Vietnam veterans’ affirmative action program.  The RAC employment application states:

Raytheon Aircraft Company is a government contractor
subject to Section 503 of the Rehabilitation Act of 1973 and Section 402 of the
Vietnam Era Veterans Readjustment Assistance Act of 1974.  These acts require this company to take action
to employ and advance in employment, in accordance with its policies, qualified
handicapped/disabled individuals, disabled veterans and veterans of the Vietnam era. 
If you have such a handicap/disability, or you are a disabled veteran
and would like to be considered under the Affirmative Action Program, please
complete the information requested below.

 

Miller also executed an employee
assignment agreement and an employee confidentiality agreement at the request
of RAC.  In the assignment agreement,
Miller gives RAC permission to search his person or vehicle and he agrees that
any inventions he creates or patents he obtains while working at RAC will
become the exclusive property of RAC. 
The agreement does not recite any consideration.  In the confidentiality agreement, Miller
promises not to disclose confidential information to anyone outside of RAC in
consideration of payment of his salary. 
Miller also executed a compensation agreement that set forth his salary
in terms of the amount he was to receive every two weeks.  In addition, RTA’s policy manual contains a
ten-year pay scale.  

          This
evidence does not unequivocally indicate RAC’s or
RTA’s intent to be bound not to terminate Miller except under clearly specified
circumstances.  See Brown, 965
S.W.2d at 502.  While the federal
affirmative action program requires RAC and RTA to hire and advance Vietnam veterans, the program in no way limits an
employer’s ability to discharge employees at will, regardless of any Vietnam veteran status.  See 38
U.S.C. § 4212(a)(1).  RTA’s policy
manual specifically states that it is an at-will employer, and RTA “reserves
the right to terminate employment for any reason at any time.”  The policy manual also expressly states that
it does not constitute a contract.  See Fed. Express Corp. v. Dutschmann, 846 S.W.2d 282, 283 (Tex. 1993) (“A disclaimer in
an employee handbook, such as the one included by Federal Express, negates any
implication that a personnel procedures manual places a restriction on the
employment at will relationship.”).

The other evidence cited by Miller,
including the offer letter and employment agreements, also does not indicate
any intent
on the part of RAC or RTA to be bound not to terminate Miller except under clearly
specified circumstances.  See Jones, 92 S.W.3d at 487–88 (holding offer letter that contained
statements of annual salary and general statement that salary is based on
future performance did not create employment contract); Brown,
965
S.W.2d at 502 (“An employee who has no formal agreement with his
employer cannot construct one out of indefinite comments, encouragements, or
assurances.”); Rios
v. Tex. Commerce Bancshares, Inc., 930
S.W.2d 809, 815 (Tex. App.—Corpus Christi 1996, writ denied)
(holding letter offering employment was not contract because it merely stated
salary and other benefits but did not set term of employment); Massey
v. Houston Baptist Univ., 902 S.W.2d 81, 83–84 (Tex. App.—Houston
[1st Dist.] 1995, writ denied) (holding written employment contract did not
alter at-will employment relationship because contract contained no term
limiting employer’s ability to terminate employee at will); Lee-Wright,
Inc. v. Hall, 840 S.W.2d 572, 578 (Tex. App.—Houston [1st Dist.]
1992, no writ)
(holding at-will status of employment relationship altered by agreement to
employ plaintiff for specific number of years).  Miller failed to produce more
than a scintilla of evidence that he had an employment contract with RAC or
RTA.  See
Jackson,
979 S.W.2d at 70–71.  The trial court
therefore properly granted RAC and RTA’s summary judgment on Miller’s breach of
contract claims.

B.  FOC’s
Summary Judgment 

          In its traditional motion for summary judgment, FOC
contends that it established as a matter of law that no employment contract
existed between itself and Miller that would limit its ability to terminate
Miller’s employment at will.  Miller
contends that in addition to the evidence cited above, the following evidence
establishes an employment contract between himself and FOC. 

          The combination agreement between FOI and RTA provides: 

At the Effective Time, except as
specifically provided below in this Section 6.2, [FOC] hereby agrees to
assume, and agrees to pay, perform and discharge when due, all obligations and
liabilities for compensation and employee benefits, and all other liabilities
which are attributable to [FOI’s] or [RTA’s] employment of any employee, agent
or independent contractor prior to the Effective Time without regard to whether
such obligations or liabilities arose prior to or subsequent to the Effective
Time. 

 

In December 2001, RTA’s
president, Gary Hart, wrote to RTA’s pilots to announce that all pilots would
be offered the opportunity to continue flying for FOC.  A few weeks later, Miller received a letter
from Kenneth Ricci, Chairman and CEO of FOI. 
The letter stated, “all pilot positions will be retained and all pilots
will be assured of their current flying positions and seniority” at FOC.  The letter also contained a comparison
between Miller’s salary at RTA and his new salary at FOC.  Miller received a letter offering him
employment at FOC in February of 2002. 
He accepted the offer by signing at the bottom of the letter, as
requested by FOC.  

          While
FOC expressly agreed to assume the contractual obligations of RTA in the
combination agreement, this did not create an employment contract between
Miller and FOC.  As we determined above,
Miller did not have an employment contract with RAC and RTA; thus, there was no
contract for FOC to assume.  See Brown, 965 S.W.2d at 502.  

The letters Miller received from FOC
executives also do not indicate FOC’s intent to be bound not to terminate Miller
except under clearly specified circumstances. 
See id.  None of Miller’s employment documents
guarantees him a minimum term of employment, or otherwise limits FOC’s ability
to terminate his employment at will.  See Jones, 92 S.W.3d at 487–88 (holding offer letter that contained
statements of annual salary and general statement that salary is based on
future performance did not create employment contract); Brown,
965
S.W.2d at 502 (“An employee who has no formal agreement with his
employer cannot construct one out of indefinite comments, encouragements, or
assurances.”); Travel Masters, Inc. v.
Star Tours, Inc., 827 S.W.2d 830, 832–33
n.2 (Tex. 1991) (noting mere fact that employee was paid on monthly basis,
without any other evidence, failed to establish that she was not at-will employee); Rios, 930 S.W.2d at
815
(holding letter offering employment was not contract because it merely stated
salary and other benefits but did not set term of employment); Massey,
902 S.W.2d at 83–84 (holding written employment contract did not alter at-will
employment relationship because contract contained no term limiting employer’s
ability to terminate employee at will); Hall, 840 S.W.2d at 578 (holding at-will status
of employment relationship altered by agreement to employ plaintiff for
specific number of years); Ryan v. Superior Oil Co., 813
S.W.2d 594, 595–96 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (holding letters
written to employees before merger concerning plan for retaining employees
after transition do not form employment contract).  

Like the RTA policy
manual, the FOC policy and procedures manual provides that all employees at FOC
are employed on an “at will” basis, and expressly states that it does not
constitute a contract.  See Matagorda County Hosp. Dist. v. Burwell,
189 S.W.3d 738, 739–40 (Tex. 2006) (holding employer’s manual stating that
employee “may” be dismissed for cause did not modify at-will employment by
requiring that dismissal be only for cause); Dutschmann, 846 S.W.2d at 283 (“A disclaimer
in an employee handbook, such as the one included by Federal Express, negates
any implication that a personnel procedures manual places a restriction on the
employment at will relationship.”). 
Sullivan’s affidavit also states that Miller’s employment at FOC was at
will, and that FOC never offered Miller an employment contract.  

FOC introduced evidence affirmatively
establishing that it employed Miller at will. 
Accordingly, we hold that FOC has established as a matter of law that
Miller’s employment at FOC was at will.  See Brown, 965 S.W.2d at 502 (holding employment is
presumed to be at will absent specific contrary agreement).  The trial court’s
summary judgment in favor of FOC on Miller’s breach of contract claim was thus
proper.  

Common Law Claims

In his fifth issue, Miller contends the trial court erred in granting
summary judgment on his common law claims. 


A.  Promissory Estoppel

          Miller contends the trial court erred in granting summary judgment on his promissory
estoppel claims.  RAC, RTA, and FOC
respond that Miller cannot maintain promissory estoppel claims in this case
because there was no detrimental reliance as a matter of law.

The elements of a
promissory estoppel claim are: (1) a promise, (2) foreseeability of reliance
thereon by the promisor, and (3) substantial reliance by the promisee to his
detriment.  English v. Fischer,
660 S.W.2d 521, 524 (Tex.
1983).  Miller relies upon Roberts v. Geosource Drilling Services, Inc., in which the employer,
Geosource, promised Roberts employment, inducing him to quit his former
job.  757 S.W.2d 48, 49 (Tex. App.—Houston [1st Dist.] 1988, no writ).  This court held that Roberts could maintain a
promissory estoppel claim even through Roberts and Geosource had expressly
contracted that the employment would be at will.[7]  Id. at 50.  We stated, “[i]t is no answer that the
parties’ written contract was for an employment-at-will, where the employer
foreseeably and intentionally induces the prospective employee to materially
change his position to his expense and detriment, and then repudiates its
obligations before the written contract begins to operate.”  Id.

Miller’s promissory estoppel claims
fail as a matter of law because Miller did not rely on any promise to his
detriment.  The evidence in this case
that FOC hired Miller in early 2002 is undisputed, albeit for a short
time.  Moreover, Miller was not induced
to leave his former job—rather, that position was eliminated incident to the
creation of FOC.  FOC did not promise to
retain Miller for any length of time. 
Thus, even under Roberts,
there could be no detrimental reliance in this case as a matter of law.[8]  See English, 660 S.W.2d at 524; Roberts,
757 S.W.2d at 50–51.  We therefore hold
that the trial court properly granted summary judgment on Miller’s
promissory estoppel claims.  

B.  Negligent
Misrepresentation

Miller contends the trial
court erred in granting summary
judgment on his negligent misrepresentation claims.  RAC, RTA, and FOC respond that the statements
Miller complains of constitute promises of future conduct rather than
statements of existing fact and are therefore not actionable.

          The elements of a negligent misrepresentation claim are: (1)
the representation is made by a defendant in the course of his business, or in
a transaction in which he has a pecuniary interest; (2) the defendant supplies
“false information” for the guidance of others in their business; (3) the
defendant did not exercise reasonable care or competence in obtaining or
communicating the information; and (4) the plaintiff suffers pecuniary loss by
justifiably relying on the representation. 
Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 686 n.24 (Tex.
2002); McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests, 991 S.W.2d 787, 791 (Tex. 1999); Fed. Land Bank Ass’n v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991).  To establish a negligent
misrepresentation claim, the plaintiff must also prove that the defendant
misrepresented an existing fact
rather than a promise of future conduct.  See Sloane,
825 S.W.2d at 442; Dallas Fire Fighters Ass’n v. Booth Research Group, Inc., 156 S.W.3d 188, 194 (Tex. App.—Dallas 2005,
pet. denied); Swank
v. Sverdlin, 121 S.W.3d 785, 802 (Tex. App.—Houston [1st
Dist.] 2003, pet. denied); Allied Vista, Inc. v. Holt, 987
S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

          Miller bases his negligent misrepresentation claims on two
specific statements.  In December 2001,
RTA’s president, Gary Hart, wrote to RTA’s pilots to announce that all pilots
would be offered the opportunity to continue flying for FOC.  A few weeks later, Kenneth Ricci, Chairman
and CEO of FOI, sent a letter to Miller, stating that “all pilot positions will
be retained and all pilots will be assured of their current flying positions
and seniority” at FOC.  Miller asserts
that these statements were false because the master transaction agreement
creating FOC provides:

4.5 Employees.  Prior to the Closing Date, the Parties will
identify the employees of [FOI] and [RTA] that are to be offered employment
with [FOC] as of the Closing Date and shall make a formal offer of employment
to each such Person and shall inform each such Person of the compensation and
benefits for which such Person will be eligible as an employee of [FOC]. 

 

Miller’s negligent misrepresentation
claims fail as a matter of law because the statements made by Hart and Ricci
were promises of future conduct rather than statements of existing fact.  See
Dallas Fire Fighters Ass’n, 156 S.W.3d at 195 (holding statements
about movement of ranks consisted of expectation of future conduct, not
existing fact, and were not actionable); Swank,
121
S.W.3d at 802–03 (holding oral promises not to fire plaintiff,
not to take control of AMPS, and not to exercise stock options were promises of
future conduct, not existing fact); Holt, 987 S.W.2d at
141 (holding representations defendant would provide all equipment necessary to
start Louisiana plant and would pay plaintiff $55,000 annually were promises of
future conduct and not misrepresentations of existing fact); Miksch v. Exxon Corp., 979 S.W.2d 700, 706
(Tex. App.—Houston [14th Dist.] 1998, pet. denied) (holding
alleged oral promise not to terminate plaintiff was not misrepresentation of
existing fact but was promise to refrain from
taking action in future).  The trial
court therefore properly granted summary judgment on Miller’s negligent
misrepresentation claims.[9]

C.  Fraud

          Miller contends the trial court erred in granting summary judgment on his fraud claims.  RAC, RTA, and FOC respond that Miller’s fraud
claims are barred because his employment was at will.  

The elements of fraud are: (1) a material representation that was false when
made; (2) when the representation was made, the speaker knew it was false or
made it recklessly as a positive assertion without any knowledge of its truth;
(3) the speaker made the representation with the intent that the other party
should act upon it; (4) the party actually and justifiably relied on the
representation; and (5) thereby suffered injury.  Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex.
2001).  “For a promise of future performance to be
the basis of actionable fraud, it must have been false at the time it was
made.”  Schindler v. Austwell Farmers
Coop., 841 S.W.2d 853, 854
(Tex. 1992).

Miller bases his fraud
claims on the statements by Hart and Ricci promising that all RTA pilots would
be offered positions at FOC.  Miller
believes these statements were false when they were made because the master
transaction agreement seems to indicate that not all RTA pilots would be
offered positions at FOC.  

We have already determined that
Miller’s employment with RAC, RTA, and FOC was at will.  See
Brown,
965
S.W.2d at 502 (holding employment is presumed to be at will absent specific
contrary agreement).  This
court has held that “[a]n ‘at will’ employee is barred from bringing a cause of
action for fraud against his employer based upon the employer’s decision to
discharge the employee.”  Leach v. Conoco, Inc., 892 S.W.2d
954, 961 (Tex. App.—Houston [1st Dist.] 1995, writ dism’d w.o.j.); see also Brown v. Swett & Crawford
of Tex., Inc., 178 S.W.3d 373, 379–80 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding status
as at-will employee precludes claim for fraudulent inducement as matter of
law).  Miller’s fraud claims based on the
statements that FOC would hire all RTA pilots are therefore precluded as a
matter of law because Miller’s employment was at will.  The trial court properly granted summary
judgment on Miller’s fraud claims.

D.  Civil Conspiracy

          Miller contends the trial court erred in granting summary
judgment on his civil conspiracy claims. 
FOC filed a traditional summary judgment motion on Miller’s civil
conspiracy claim, alleging that Miller’s claim fails as a matter of law because
it is not supported by an underlying tort.  RAC and RTA filed a no-evidence summary
judgment motion, alleging Miller had produced no evidence of a meeting of the
minds.  

A civil conspiracy is
a combination by two or more persons to accomplish an unlawful purpose or to
accomplish a lawful purpose by unlawful means.  Firestone Steel Prods. Co. v. Barajas,
927 S.W.2d 608, 614 (Tex.
1996).  The essential elements of a civil
conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3)
a meeting of minds on the object or course of action; (4) one or more unlawful,
overt acts; and (5) damages as the proximate result.  Tri v. J.T.T., 162 S.W.3d 552, 556
(Tex. 2005); Massey v. Armco Steel Co.,
652 S.W.2d 932, 934 (Tex.
1983).  Independent liability for civil
conspiracy does not exist.  Four
Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., No. 14-05-00498-CV,
2006 WL 3589480, at *10 (Tex. App.—Houston [14th Dist.] Dec. 12, 2006, no pet.
h.).  Civil conspiracy is considered a
derivative tort because a defendant’s liability depends upon its participation
in some underlying tort for which the plaintiff seeks to hold the defendant
liable.  Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex. 1996).  An actionable conspiracy must
consist of acts that would have been actionable against the conspirators
individually.  Int’l Bankers Life Ins.
Co. v. Holloway, 368 S.W.2d
567, 581 (Tex. 1963).  Thus, to prevail on a civil conspiracy claim,
the plaintiff must show the defendant was liable for some underlying tort.  See
Trammell Crow Co. No. 60 v. Harkinson, 944 S.W.2d 631, 635 (Tex.
1997); Tilton, 925 S.W.2d at 681.

          Miller
asserts that RAC, RTA, FOI, and FOC engaged in a civil conspiracy to wrongfully
discharge pilots who refused to fly aircraft in violation of federal law.  As evidence of this conspiracy, Miller
produced the affidavits of Rusty Wharton and Reinhardt Hanold, who
testified that John Topliff informed them that he had been instructed by his
superiors at RTA to identify for termination any pilots who would not operate
aircraft that had been issued flight releases. 
Wharton and Hanold were both RTA pilots, and Topliff was RTA’s fleet
manager.  Topliff also testified that
executives at FOC pressured pilots to fly aircraft in violation of federal law
as well.  Additionally, Miller cites the
master transaction agreement and the combination agreement, which suggest that some
RTA pilots might not be offered employment at FOC.   

As we determined above, the ADA preempts Miller’s Sabine Pilot wrongful discharge claim against FOC.  Miller’s civil conspiracy claim against FOC
therefore fails as a matter of law because Miller cannot assert a wrongful
discharge claim against FOC under Sabine
Pilot.  A civil conspiracy claim
against FOC will not lie unless evidence demonstrates that FOC participated in
some underlying actionable conduct.  Tilton, 925 S.W.2d at 681; Ortiz v.
Collins, 203 S.W.3d 414, 422–23
(Tex. App.—Houston
[14th Dist.] 2006, no pet.) (holding that where summary judgment was proper
on underlying fraud claim due to lack of justifiable reliance, summary judgment
was also proper on conspiracy to defraud claim); RTLC AG Prods., Inc. v.
Treatment Equip. Co., 195 S.W.3d 824, 833 (Tex. App.—Dallas 2006, no
pet.) (holding plaintiff could not maintain civil conspiracy claim because it
could not establish underlying tort).  

Additionally, Miller produced no
evidence that RAC and RTA had a meeting of the minds to perform an unlawful act
necessary to establish his civil conspiracy claims.  See
Alford v. Thornburg, 113 S.W.3d 575,
588 (Tex. App.—Texarkana 2003, no
pet.) (holding plaintiff produced no more than scintilla of evidence of meeting
of minds); Boales v. Brighton Builders, Inc., 29 S.W.3d 159, 164 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (holding
plaintiff produced no more than scintilla of evidence of meeting of minds); J.
Parra e Hijos,
 S.A. de C.V. v.
Barroso, 960 S.W.2d 161, 170 (Tex. App.—Corpus Christi 1997, no pet.)
(holding plaintiff produced no evidence of meeting of minds).  The trial court therefore properly granted
summary judgment on Miller’s civil conspiracy claims. 

E.  Negligence

Miller contends the trial
court erred in granting summary
judgment on his negligence claims.  RAC,
RTA, and FOC respond that an employer owes an at-will employee no duty of care
in terminating his employment. 

A negligence cause of
action has three elements: (1) a legal duty owed by one person to another, (2) a
breach of that duty, and (3) damages proximately caused by the breach.  D.
Houston, Inc. v. Love, 92 S.W.3d 450, 454 (Tex.
2002).  The threshold inquiry in a
negligence case is duty.  Centeq Realty, Inc. v. Siegler, 899
S.W.2d 195, 197 (Tex. 1995).  The Texas Supreme Court has held that an
employer owes no duty of care in discharging an at-will employee.  See
Tex.
Farm Bureau Mut. Ins. Cos. v. Sears, 84 S.W.3d 604, 609 (Tex. 2002). 
The court stated:   

By definition, the employment-at-will
doctrine does not require an employer to be reasonable, or even careful, in
making its termination decisions.  If the
at-will doctrine allows an employer to discharge an employee for bad reasons
without liability, surely an employer should not incur liability when its
reasons for discharge are carelessly formed. 
Engrafting a negligence exception on our at-will employment
jurisprudence would inevitably swallow the rule.

 

Id.  

Miller contends that RAC,
RTA, and FOC were negligent in terminating his employment.  As we determined above, Miller’s employment
with RAC, RTA, and FOC was at will.  See Brown, 965 S.W.2d at 502
(holding employment is presumed to be at will absent specific contrary
agreement).  RAC, RTA, and
FOC therefore did not owe Miller a duty of care in terminating his employment.  Miller’s negligence claims fail as a matter of
law.  See
Wal-Mart
Stores, Inc. v. Canchola, 121 S.W.3d 735, 740 (Tex. 2003); Sears,
84 S.W.3d at 609.  The trial court properly granted summary
judgment on Miller’s negligence claims.

F.  Intentional Infliction
of Emotional Distress

Miller contends the trial
court erred in granting
summary judgment on his intentional infliction of emotional distress
claims.  Miller maintains that he
suffered severe emotional distress because he was required to pilot aircraft
that were not safe to fly, and because he did not know whether RTA’s aircraft
contained latent mechanical defects due to other pilots having concealed such
defects at the request of RAC and RTA.  

The elements of
intentional infliction of emotional distress are: (1) the defendant acted
intentionally or recklessly; (2) the conduct was extreme and outrageous; (3)
the defendant’s actions caused the plaintiff emotional distress; and (4) the
emotional distress that the plaintiff suffered was severe.  City of Midland
v. O’Bryant, 18 S.W.3d 209, 216 (Tex.
2000).  To be considered extreme and
outrageous, conduct must be so outrageous in character, and so extreme in
degree, as to go beyond all possible bounds of decency, and to be regarded as
atrocious and utterly intolerable in a civilized community.  Id. at 217.  “[A] claim for intentional infliction of
emotional distress does not lie for ordinary employment disputes.”  GTE Sw., Inc. v. Bruce, 998 S.W.2d
605, 612–13 (Tex. 1999).  The mere fact of termination of employment, even
if the termination is wrongful, is not legally sufficient evidence that the
employer’s conduct was extreme and outrageous.  Sw. Bell Mobile Sys., Inc. v. Franco,
971 S.W.2d 52, 54 (Tex. 1998).

The evidence Miller
produced demonstrates that he suffered emotional distress because FOC
terminated his employment and he was required to search for a new job.  Even if FOC wrongfully terminated Miller,
this fact alone would not support a claim for intentional infliction of
emotional distress.  See id. (“However, the mere fact
of termination of employment, even if the termination is wrongful, is not
legally sufficient evidence that the employer’s conduct was extreme and
outrageous under the rigorous standard that we established in Twyman.”).  The
trial court therefore properly granted summary judgment on Miller’s intentional
infliction of emotion distress claims.

G. 
Wage and Hour Claims

Miller contends the
trial court erred in granting RAC and RTA’s motion for summary judgment on his
wage and hour claims.  Miller maintains
that RAC and RTA only paid him for six weeks of accrued vacation time even
though he was entitled to eight weeks’ pay. 
Miller asserts that RTA is liable for these two weeks of vacation pay
because RTA owns a controlling interest in FOC. 
In their traditional motion for summary judgment, RAC and RTA assert
that they are not liable for these wages as a matter of law because they transferred
their liability for Miller’s wage and hour claims to FOC.

In his affidavit,
William Wallisch states:

In connection with the creation of
Flight Options, L.L.C., Travel Air and Flight Options, Inc. agreed that Flight
Options, L.L.C. would assume any and all liabilities related to any vacation
time that had been accrued by Travel Air pilots, including Plaintiff, prior to
the this [sic] transaction.  

 

An examination of the
combination agreement confirms Wallisch’s statements.  

This undisputed evidence
establishes as a matter of law that RAC and RTA transferred their liability for
Miller’s wages to FOC.  See Tex. R. Civ.
P. 166a(c); KPMG Peat Marwick, 988 S.W.2d at 748.  The only
evidence Miller cites in support of his wage and hour claims against RAC and
RTA is Wallisch’s testimony that RTA owns a controlling interest in FOC.  The fact that RTA now owns a
controlling interest in FOC does not make it liable for these wages.  FOC is organized as a Delaware
limited liability company and under Delaware law, the members of an L.L.C. are generally
not liable for the obligations of the L.L.C., absent a showing that the court
should pierce the corporate veil.  See
Del. Code Ann. tit. 6, §
18-303(a) (2005); Irwin &
Leighton, Inc. v. W.M. Anderson Co.,
532 A.2d 983, 987–89 (Del. Ch. 1987).  The trial court therefore properly granted
summary judgment on Miller’s wage and hour claims against RAC and RTA.

 

Conclusion

We hold that (1) the trial court did
not abuse its discretion in refusing to strike William Wallisch’s affidavit,
(2) RAC and RTA established that they terminated Miller’s employment for a
reason other than his refusal to perform illegal acts, negating the causation
required for a Sabine Pilot claim as
a matter of law, (3) the Airline Deregulation Act of 1978 preempts Miller’s Sabine Pilot wrongful discharge claim
against FOC, and (4) the trial court properly granted summary judgment on
Miller’s breach of contract and common law claims.  We therefore affirm the trial court’s orders
granting summary judgment.

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Jennings and Bland.

 

 

 











[1] Sabine
Pilot Serv., Inc. v. Hauck, 687 S.W.2d 733, 735 (Tex. 1985).





[2] 49 U.S.C. § 41713(b)(1) (2000).





[3] FOC also maintains that the trial court’s summary
judgment properly disposed of Miller’s wrongful discharge claim because he was
fired for reasons other than his refusal to perform an illegal act, and any
action that FOC requested him to take would not have resulted in criminal
penalties.  As we agree with FOC’s
preemption argument, we do not address the other potential grounds for the
trial court’s summary judgment.

 





[4] The Texas Supreme Court consolidated two negligence
cases for the Kiefer opinion.  Cont’l Airlines, Inc. v. Kiefer, 920 S.W.2d 274, 275 (Tex. 1996).  In the first case, a passenger was injured
when a briefcase fell from an overhead storage bin and struck her on the
head.  Id.  In the second case, the plaintiff claimed he
was injured by the airline’s negligent failure to provide meet and assist
services.  Id. at 275–76. 

 





[5] Miller contends FOC’s certificate was not properly
before the trial court because it was not attached to FOC’s supplemental motion
for summary judgment.  FOC produced the
certificate for the first time in its reply to Miller’s response to the
supplemental motion for summary judgment. 
Miller did not move to strike this evidence and the trial court noted
that it considered the “pleadings on file” in its summary judgment order.  As the Texas Supreme Court has explained, the
trial court’s ruling on a summary judgment is based upon the “issues raised in the motion, response, and any
subsequent replies.”  Stiles
v. Resolution Trust Corp., 867 S.W.2d 24, 26 (Tex.
1993).  The certificate was therefore
properly before the trial court.  

 





[6] Additionally, we note that Congress amended the ADA in the year 2000 and added a provision creating a
federal whistleblower cause of action for employees discharged or discriminated
against for reporting an employer’s violations of federal law.  49 U.S.C. 
§ 42121 (2000).  This whistleblower cause
of action provides a uniform system of recourse for employees discharged or
discriminated against for reporting their employers’ violations of federal law.  Id.  While we
recognize that Miller was not a whistleblower in this case, he had an available
remedy if FOC had terminated him for reporting a violation of federal law.  See
id. 
The fact that federal law expressly addresses whistleblower claims
against air carriers strengthens our conclusion that the ADA
preempts Miller’s Sabine Pilot
wrongful discharge claim arising from his refusal to fly aircraft in violation
of federal law.  Compare Delta Air Lines, Inc. v. Black, 116 S.W.3d 745, 756 (Tex.
2003) (finding preemption of contract claim where FAA had created regulations
to resolve dispute involved in plaintiff’s breach of contract claim), with Kiefer,
920 S.W.2d at 281 (finding no preemption of common law negligence claims when
Congress and FAA had created no method to resolve disputes involving negligence);
see also Botz v. Omni Air Int’l, 286
F.3d 488, 496 (8th Cir. 2002) (noting that whistleblower statute evidences
Congress’s intent to preempt state law whistleblower claims related to air
safety); but see Branche v. Airtran
Airways, Inc., 342 F.3d 1248, 1260 (11th Cir. 2003) (holding safety
inspector’s state law whistleblower claim was not preempted by ADA because
claim was not related to air carrier services).

 





[7] The Fourteenth Court of Appeals has held that “[a] promise to provide employment which is subject to
termination at any time or for any reason does not provide any assurances about
the employer’s future conduct, and does not provide a basis for detrimental
reliance as a matter of law.”  Collins v.
Allied Pharmacy Mgmt., Inc., 871 S.W.2d 929, 937 (Tex. App.—Houston
[14th Dist.] 1994, no writ).

 





[8] In Collins,
the Fourteenth Court of Appeals noted the absurdity of this result: “[W]e believe Roberts
abrogates the employment at will doctrine in all cases where the employee must
quit an existing job to accept a new offer of employment.  Also, we find it would be illogical to hold
that an employee has no remedy if he is fired one week after commencing work,
but may recover damages if the employer refuses to allow him to commence work
at all.”  871 S.W.2d at
937.  





[9] In his appellate brief, Miller also complains about
additional negligent misrepresentations concerning flight releases RTA issued
to its pilots. 
Miller did not plead these misrepresentations and the parties did not
address them in their summary judgment motions. 
We cannot address these misrepresentations on appeal because they were
not presented to the trial court.  Tex. R. Civ. P. 166a(c) (“Issues not
expressly presented to the trial court by written motion, answer or other
response shall not be considered on appeal as ground for reversal.”); City of Houston v. Clear Creek Basin
Auth., 589 S.W.2d 671,
675 (Tex. 1979) (holding issues not expressly presented to trial court may not
be considered on appeal as ground for reversal of summary judgment).